530 F.2d 215
 8 ERC 1105, 5 Envtl. L. Rep. 20,651
 STATE OF MARYLAND, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
SAFEWAY STORES, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respndent.
SEARS, ROEBUCK & COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
GENERAL MOTORS CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
THE MAY DEPARTMENT STORES COMPANY Et AL., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
BETHLEHEM STEEL CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 74--1007, 74--1026, 74--1037 and 74--1062 to 74--1064.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 17th, 1974.
Decided Sept. 19, 1975.
Certiorari Granted June 1, 1976.
See 96 S.Ct. 2224.
 
 Martin A. Ferris, III, Sp. Asst. Atty. Gen. of Md. (Francis B. Burch, Atty. Gen. of Md., on brief), for the State of Md.
 William H. King, Jr., John S. Battle, Jr., Richmond, Va. (McGuire, Woods & Battle, Richmond, Va., on brief), for Safeway Stores.
 William F. Patten, Washington, D.C. (Harvey H. Holland, Jr., Benjamin Cabell, IV, Wilkes & Artis, Washington, D.C., Robert F. Maxwell and Robert A. DiFilippo, St. Davids, Pa., on brief), for Sears, Roebuck & Co.
 William Gar Richlin, Columbia, Md. (Roger D. Redden, Baltimore, Md., Frazer F. Hilder and Raymond T. Murphy, Detroit, Mich., on brief), for General Motors.
 David J. Toomey, New York City, Leonard E. Santos (Michael W. Smith, Christian, Barton, Parker Epps & Brent, Richmond, Va., Frank E. Morris, Joseph J. C. Ranalli, Terrence MacLaren, Pennie & Edmonds, New York City, John J. Ross, Peter W. Tredwick, Hogan & Hartson, Washington, D.C., Allan D. Shafter, Barbara E. Schur, Alan S. Langer and Mark Curran, New York City, on brief), for May Dept. Stores.
 Alan D. Yarbro, Baltimore, Md. (Anthony M. Carey, John G. Lamb, Jr., and Venable, Baetjer & Howard, Baltimore, Md., on brief) for Bethlehem Steel.
 John E. Bonine, Atty., E.P.A., and Bruce J. Chasan, Atty., U.S. Dept. of Justice, (Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Atty. U.S. Dept. of Justice, Alan G. Kirk, II, Asst. Administrator for Enforcement and Gen. Counsel, and William F. Pedersen, Atty., E.P.A., on brief) for respondent.
 Before WIDENER, Circuit Judge, and MACKENZIE and WARRINER, District Judges.*
 WIDENER, Circuit Judge:
 
 
 1
 This is a consolidated petition for review under 42 U.S.C. § 1857h--5(b)(1)[1] of certain regulations of the Environmental Protection Agency (EPA) promulgated under the authority of 42 U.S.C. § 1857c--5(c)[2] and 42 U.S.C. § 1857g[3] and affecting the area known as the Metropolitan Baltimore Intrastate Air Quality Control Region. Although not all of the petitioners challenged the same regulations for the same reasons, there was sufficient similarity in their claims to consolidate the petitions and hear argument together.
 
 
 2
 The specific regulations challenged by the private petitioners[4] are:
 
 
 3
 Employer's Provision for Mass Transit Priority Incentives--40 CFR § 52.1105,
 
 
 4
 Management of Parking Supply--40 CFR § 52.1111;
 
 
 5
 Control and Prohibition of Sources of Photochemically Reactive Organic Materials--40 CFR § 52.1112; and
 
 
 6
 Control of Evaporative Losses from Vehicular Tanks--40 CFR § 52.1102.
 
 
 7
 The State of Maryland challenges the right of, as well as the justification for, the EPA to require that it enact programs calling for retrofit of pollution control devices on certain classes of vehicles and the establishment of bikeways. 40 CFR §§ 52.1095--52.1100, 52--1106. Maryland has also called for a complete reevaluation of the Baltimore Transportation Plan.
 
 
 8
 The Clean Air Act, as amended, 42 U.S.C. § 1857 et seq., provides that the Administrator of the EPA shall publish national standards for air quality as to those pollutants which have been determined by EPA, based on the latest scientific data, to be harmful to the public health or welfare. 42 U.S.C. §§ 1857c--3, 1857c--4. For each pollutant, a primary standard is to be established to protect the public health and a secondary standard to protect the public welfare. On April 30, 1971, the EPA promulgated such regulations for sulfur oxides, particulate matter, carbon monoxide, photochemical oxidants, hydrocarbons, and nitrogen dioxide. 40 CFR §§ 50.4--50.11 (April 30, 1971).
 
 
 9
 The statute provides that the states shall have the primary responsibility for achieving and maintaining these air quality standards. 42 U.S.C. § 1857c--2. Each state was given the opportunity to submit to the EPA, not later than January 1, 1972 (nine months after the promulgation of the standards), implementation plans which would achieve the primary standards within three years and the secondary standards within a specified reasonable time. 42 U.S.C. §§ 1857c--5(a)(1), 1857c--5(a)(2)(A). Such plans were to include, among other requirements, 'emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary and secondary standard, including, but not limited to, land-use and transportation controls.' 42 U.S.C. § 1857c--5(a)(2)(B). On application by the governor of a state, the EPA may grant an extension of time, not to exceed two years, within which to achieve the primary standard, provided the state has shown that it is unable to meet the standard with available or alternative technology. 42 U.S.C. § 1857c--5(e). After review of a state's plan, the EPA may accept it, or reject it and issue its own implementation plan for the area. 42 U.S.C. § 1857c--5(c)(1).
 
 
 10
 Maryland submitted its regional plan on January 28, 1972. On May 31, 1972, the EPA also permitted several states, including Maryland, until February 15, 1973 to amend their implementation plans. 37 Fed.Reg. at 10844. In addition, the EPA granted Maryland an extension of two years in its attainment dates for the national carbon monoxide standards. 37 Fed.Reg. 10871.
 
 
 11
 Subsequently, the United States Court of Appeals for the District of Columbia, in Natural Resources Defense Council v. EPA, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973), held that a blanket delay in the submission of plans or a similar blanket extension of achievement dates was not permitted. Based on that decision, the EPA notified Maryland that its extension was canceled and that complete plans were to be filed by April 15, 1973. 38 Fed.Reg. 7323 (March 20, 1973).
 
 
 12
 Maryland then filed its plan on April 16, 1973, along with a request for a two-year extension. The EPA denied the extension and disapproved portions of Maryland's April 16th plan on June 15, 1973. 38 Fed.Reg. 16558--16559, 16565--16566 (June 22, 1973). On August, 2, 1973, the EPA published proposed regulations to supplement the Maryland plan. 38 Fed.Reg. 20769--20779 (August 2, 1973). Following public hearings held in Baltimore on September 5, 1973, the EPA promulgated the balance of the regulations in issue here. 38 Fed.Reg. 34230--34257 (December 12, 1973). These included provisions which provided that the 'state of Maryland shall' establish automobile inspection and maintenance programs as well as retrofit programs. Taken in view of the preamble published at 38 Fed.Reg. 30626 (November 6, 1973), the EPA obviously took the position that these regulations constituted a comprehensive plan for implementation of the Clean Air Act in the Baltimore area, and would produce reductions in pollutants sufficient to meet national standards by 1977. 38 Fed.Reg. 34240 (December 12, 1973).
 
 
 13
 Thereafter, in June of 1974, Congress froze the standards for light duty vehicles and engines manufactured during the model years 1975 and 1976. P.L. 93--319(5)(a). The EPA itself revoked 40 CFR § 52.1112, styled the control and prohibition of sources of photochemically reactive organic material. 40 Fed.Reg. 5523 (February 6, 1975). It also suspended indefinitely 40 CFR § 52.1111 providing for the management of parking supply. 40 Fed.Reg. 2586 (January 14, 1975, pending amendment), 40 Fed.Reg. 29713 (July 15, 1975, without qualification pending Congressional action). In addition, the EPA has advised by letter dated March 25, 1975 that it is rescinding 40 CFR § 52.1097, the oxidizing catalyst retrofit program for medium and light duty vehicles. Finally, the EPA has taken the position that an indefinite suspension of any regulation entitled an aggrieved person, before reimposition of that regulation, to ask for review upon the same terms as were originally available.
 
 
 14
 * Standard of Review
 
 
 15
 In reviewing an implementation plan under the Clean Air Act, the reviewing court must apply substantially the same standards imposed by the Administrative Procedure Act. See Citizens to Preserve Overton Park v. Volpe,401 U.S. 402, 413--14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). The authority to make such regulations must be found in the statute, the procedures followed must be lawful, and the plan must be constitutional. If these requirements are met, the challenged regulations may be set aside only where they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A). Accord Union Electric Co. v. EPA, 515 F.2d 206, 214 (8th Cir. 1975) and authorities cited therein. In arriving at such a determination, the court must: "engage in a substantial inquiry' into the reasonableness of the agency action . . . and as a part of that 'inquiry' it 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment' . . . since 'it is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." Appalachian Power Co. v. EPA, 477 F.2d 495, 507 (4th Cir. 1973), (citations omitted). And, under Appalachian Power, which sets out the standard of review in this circuit, the courts must not substitute their judgment for that of the agency which Congress has entrusted with the responsibility of weighing the many competing factors. Accord Ethyl Corp. v. EPA, (D.C. Cir., No. 73--2205, 1975). Nevertheless, the record must indicate that all such factors were weighed by the agency, and must support the decision which was reached.
 
 
 16
 Numerous objections to the Agency's plan have been raised in these consolidated actions. They call into question the procedural aspects of the EPA's rulemaking, the constitutionality of its regulations, and their rationality. While we find some parts of the regulations to be contrary to law, in view of the disposition we make of the case, we do not reach the many constitutional issues raised or most of the multitude of procedural questions posed by the parties.
 
 II
 
 17
 Employers Provision for Mass Transit Priority Incentives, 40
 
 CFR 52.1105(EMTI)
 
 18
 * 40 CFR § 52.1105 requires each employer within the region who maintains more than 700 employee parking spaces (to be later reduced so as to apply to those maintaining more than 70 such spaces) to submit to the EPA a plan for encouraging employees to use mass transit facilities rather than single passenger automobiles. The only criteria governing the acceptability of such a plan is that:
 
 
 19
 '. . . the Administrator shall approve such program for each employer if he finds it to be adequate, and shall disapprove it if he finds it not to be adequate.' 40 CFR § 52.1105(c) (emphasis added).
 
 
 20
 We note complete absence of any established relevant factors which the Administrator considers in approving or disapproving an implementation plan. So without any stated criteria, the EPA has unlimited discretion in deciding which plan will or which will not be approved, and of equal significance, the employer is given no guidance whatsoever as to how he might draft an acceptable plan other than he must 'encourage the use of mass transit' and 'discourage the use of single passenger automobiles' by his employees. While several suggested restrictive measures are set forth in the regulation,[5] an employer's ingenuity and know-how in implementing the regulation faces an impossible task, for the regulation does not advise him of a goal to be attained or of the factors to be considered by the Administrator in determining whether a particular program is 'adequate.'
 
 
 21
 The EPA has admitted in its brief that it is practically impossible for an employer to ascertain what will constitute an acceptable plan. According to the EPA:
 
 
 22
 '(t)he appropriate measures in any given instance will depend upon the location of the employer and the employees, the availability of mass transit, traffic patterns, and many other factors. These matters can be judged only on an ad hoc basis. It may be that one transit incentive plan providing for a ten percent reduction in VMT will be disapproved because a twenty percent reduction is feasible, while another transit incentive plan providing for a five percent reduction in VMT will be approved because it is the most feasible plan under the circumstances.' EPA brief at 33.
 
 
 23
 While the EPA brief attempts to cure the regulation by suggesting some factors the Administrator should consider in his ad hoc determination of adequacy, the regulation itself suggests none. It has recently been held in a similar case that such vagueness invalidated a parking regulation imposed under the Clean Air Act. In South Terminal Corp. v. EPA, 504 F.2d 646 (1st Cir. 1974), the court stated:
 
 
 24
 'We are concerned, however, by the standardlessness of subsection (d). The clause permits denial of a permit unless the functionary passing on such requests decides that the facility 'will not interfere with the attainment or maintenance of applicable Federal Air Quality Standards. . . .' * * * The regulation does not indicate how 'interference' is to be judged, nor does it state who must bear the burden of showing non-interference. The prospective applicant for a permit is utterly without guidance as to what he must prove, and how. And the standard is so vague that it invites arbitrary and unequal application.
 
 
 25
 . . . We disapprove the 'interference' clause as now worded.' 504 F.2d at 670.
 
 
 26
 We are of the opinion that the regulation in question, 40 CFR § 52.1105, is likewise impermissibly vague. It states neither a goal to be attained, nor a standard to be applied, nor factors to be used by the Administrator in his determination as to adequacy. An employer may read the regulation in vain for guidance as to what his mass transit program should contain in order to receive administrative approval.
 
 
 27
 Common sense dictates that if the same number of people are transported to and from their work by fewer motor vehicles, there will be fewer pollutants discharged into the atmosphere and the laudable purpose of clean air will be served. But the employer, and in many instances the employees, who must bear the brunt of the reduced vehicular traffic, must be given some reasonable direction as to what is demanded of them by the government. Moreover, this court, before it can make an intelligent determination as to whether the Administrator's action is arbitrary or capricious, must know what the relevant factors are that are to be considered in approving or disapproving such programs. Accord Union Electric Co. v. EPA, 515 F.2d 206 (8th Cir. 1975).
 
 
 28
 We do not suggest a solution, but only decide the case before us. Nothing in the record indicates the EPA faces an impossible task in framing a regulation of sufficient specificity.
 
 B
 
 29
 Neither the Maryland plan submitted on April 16, 1973 nor the EPA's proposed rulemaking promulgated on August 2, 1973 made any mention of a program which resembles the Employers Mass Transit Program set out in 40 CFR § 52.1105. While the proposed rulemaking mentioned limitations upon on-street parking, as well as upon construction of additional parking spaces, the only thing the EPA can point to to show the Employers Mass Transit Incentive Program should have been expected in the Baltimore region is that on the same day the EPA proposed a measure entitled 'Reduction of Employee Parking' for the National Capital Interstate Air Quality Control Region. 38 Fed.Reg. 20787, § 52.1096 (August 2, 1973). Yet, the regulation here under review did not appear in the Baltimore plan until published in final form on December 12, 1973. It was only then that the EPA offered to receive comments and limited their receipt to those filed prior to January 14, 1974.
 
 
 30
 Clearly, the promulgation of implementation plans under the Clean Air Act by the EPA is 'rulemaking.'[6] Buckeye Power Inc. v. EPA, 481 F.2d 162, 170--71 (6th Cir. 1973); Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 693 (9th Cir. 1949), cert. den., 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949). The Administrative Procedure Act requires notice be given of proposed rulemaking and specifies that it include 'either the terms or substance of the proposed rule or a description of the subject and issues involved.' 5 U.S.C. § 553(b) (3). The Clean Air Act itself requires the EPA to consider any State hearing or record and 'publish proposed regulations setting forth an implementation plan . . . for a State . . ..' 42 U.S.C. § 1857c--5(c)(1).
 
 
 31
 The petitioners argue that at no time prior to December 12, 1973 were they given notice that employer mass transit incentive provisions were being considered, and that, as a result, they have been denied a reasonable opportunity to evaluate and consider these measures. They argue that the Agency's willingness to accept post-promulgation comments after the fact from interested parties is evidence of the confusion attendant to the adoption of certain of the strategies included in the plan and illustrates a lack of prior information. We agree.
 
 
 32
 The need for adequate hearing proceedings was emphasized by this court in Appalachian Power Co. v. EPA, 477 F.2d 495 (4th Cir. 1973). In that case, we were reviewing the EPA's approval of a state pollution control program. We held that the EPA need not conduct hearings prior to its decision if the state hearings were adequate and the EPA properly considered their findings. As we stated:
 
 
 33
 'This conclusion (that no EPA hearing is required) . . . is based on the assumption that at the state hearing interested parties were afforded full opportunity to present their contentions with respect to the proposed plan. Because of the nature of the regulations and their drastic impact, such opportunity might well include the right to more than merely the opportunity to comment. (Citation omitted) What is required in all instances, whatever the character of the administrative action, is 'the reality of an opportunity to submit an effective presentation,' and, if in the context of the issues involved, 'cross-examination on the crucial issues' is found proper, such right should be recognized and upheld.' 477 F.2d 495, 503.
 
 
 34
 At the hearing on September 5, 1973, no one discussed the Employers Mass Transit Incentive Program. This adds weight to the petitioners' contention that they were denied 'an opportunity to participate in the rulemaking.' 5 U.S.C. § 553(c). In South Terminal, the notice mentioned reducing off-street parking, and during the subsequent hearing there was discussion of 'reducing parking facilities where plants . . . (could) be served by mass transit.' 504 F.2d at 659. Here, however, the notice did not mention off-street parking, and at the hearing there was no discussion of reducing employee parking spaces. Since the disputed regulations were not subject to hearings at a state level, were not a part of the proposed regulations that were subject to comment, and were not mentioned prior to December 12, 1973 when they were issued in final form, it is clear that the intensive pre-promulgation inquiry anticipated by Appalachian Power was not afforded the petitioners. The reception of comments after all the crucial decisions have been made is not the same as permitting active and well prepared criticism to become a part of the decision-making process.
 
 
 35
 We are, therefore, of opinion that the regulation is invalid as a result of the lack of notice required by Appalachian Power, and failure to comply with the notice and publication requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)(3), and the statute itself, 42 U.S.C. § 1857c--5(c)(1). We emphasize again, as we did in Appalachian Power, that, in light of the 'drastic impact' which compliance with regulations such as this will have, adherence to applicable statutory provisions is necessary.III
 
 
 36
 Management of Parking Supply 40 CFR § 52.1111
 
 
 37
 Given the fact that the EPA has indefinitely suspended 40 CFR § 52.1111, while at the same time taking the position that such suspension entitles one aggrieved to a new right of review upon reinstatement, we do not feel that the issues raised by the petitioners should be considered at this time. When, and if, the EPA reimposes the provisions of this regulation, the parties will have ample opportunity to present their objections to its implementation. Accord County of Contra Costa v. EPA (9th Cir. 1975). In declining to rule on the regulation involved, we in no way imply that we would not follow the holding in South Terminal with respect to a similar interference clause there deemed to be standardless.
 
 IV
 
 38
 Control and Prohibition of Sources of Photochemically
 
 
 39
 Reactive Organic Materials, 40 CFR § 52.1112
 
 
 40
 The EPA concluded that 40 CFR § 52.1112 regulating sources of photochemically reactive organic materials was vague and, on January 31, 1975, rescinded it. 40 Fed.Reg. 5523 (January 31, 1975). Thus, this regulation is no longer part of the Maryland plan and will not be considered at this time.
 
 V
 
 41
 Control of Evaporation Losses from Vehicular Tanks, 40 CFR §
 
 52.1102
 
 42
 40 CFR § 52.1102 was designed to prevent the discharge into the atmosphere of gasoline vapors from the nozzles used in filling automobile gasoline tanks. It was also intended to provide for the recovery of at least 90% of the organic compounds displaced from such tanks upon filling, and to prevent overfills and spillage arising therefrom.
 
 
 43
 On June 18, 1974, the EPA relaxed the compliance schedules and reopened the comment period due to the 'substantial confusion' which had 'arisen as to the type of equipment and necessary recovery efficiency required to comply.' 39 Fed.Reg. 21049--53, esp. 21051.
 
 In so doing, the Agency noted that:
 
 44
 '(t)he Administrator has concluded that there have been sufficient developments since the regulations were drafted, and that there is sufficient uncertainty about which system will be approvable as to be in compliance with these regulations to warrant a reopening of the opportunity for public comment on this issue until July 31, 1974. In addition, an EPA--funded testing program is being carried out in San Diego County to attempt to measure the performance of various systems with results expected by August 1, 1974.' Id. at 21051.
 
 
 45
 We have not been advised of the results of the testing program, and, so far as we are informed, neither have the parties. It may be that the Administrator will soon be able to advise what devices are approved and end the uncertainty. The court has had an indication that such may be that case in the allied cases of Texaco, Inc. v. EPA, No. 74--1011, and Gulf Oil Corp. v. EPA, No. 74--1052, which were severed from these cases and action deferred.
 
 
 46
 The EPA takes the position that a requested stay filed by Bethlehem Steel, one of the numerous private parties herein, is premature because no application has been made to the Agency. See Fed.R.App. P. 18. While this position may have some merit, a literal application of Rule 18 of the Federal Rules of Appellate Procedure during the pendency of a review and in the midst of changing regulations would seem of doubtful value. Nevertheless, we decline to grant a stay of the regulation.
 
 
 47
 We are thus faced with the problem of the proper course to take. If the Administrator does not know that device will be approved, it is obvious that neither the court nor the petitioners do. The compliance schedule dates were extended so that the last construction date fell on May 1, 1975. 39 Fed.Reg. 21051. Hopefully, the technical data is available and has been distributed so this aspect of the case may be dismissed as moot. If it has not, the petitioners may begin anew for all practical purposes if they feel harmed.
 
 
 48
 We, therefore, are of opinion to remand this regulation to the EPA for such further consideration as may be appropriate. It may be the EPA will simply reimpose the regulation. If such should be the case, all objections available now or later may be made at that time, including requests for stays and reinstatement of this matter on the docket.
 
 
 49
 All matters relating to 40 CFR § 52.1102 will be consolidated with those of the Texaco and Gulf cases, Nos. 74--1011 and 74--1052, and jurisdiction of the matter retained. We feel certain the parties will advise us should a need for our further action be required.
 
 VI
 Claims of the State of Maryland
 
 50
 As mentioned before, Maryland submitted its plan to the Administrator, who approved parts of it and disapproved parts of it. For the purposes of our discussion, we consider only the inspection and maintenance program, 40 CFR § 52.1095; vacuum spark advance disconnect retrofit of pre-1968 light duty vehicles, 40 CFR § 52.1096; air/fuel control retrofit of certain 1968--71 light duty vehicles, 40 CFR § 52.1098; certain pre-1974 medium duty vehicles, 40 CFR § 52.1099; heavy duty vehicles, 40 CFR § 52.1100; and the establishment of bikeways, 40 CFR § 52.1106.
 
 
 51
 While certain parts of Maryland's Transportation Plan were accepted, some were rejected by the EPA because, among various reasons, the 'legal authority' was not submitted in the plan. The EPA then required Maryland to 'establish' an inspection and maintenance program, § 52.1095, various retrofit programs, §§ 52.1096--1100, and a system of bikeways and parking facilities, § 52.1106. The regulations concerning inspection and maintenance, retrofit and bikeway programs all required Maryland to submit 'legally adopted regulations' which established or implemented the programs as promulgated by the EPA. The inspection and maintenance regulations required Maryland to submit 'the text of needed statutory proposals and regulations that it will propose for adoption' as well as the 'text of needed legislation' for funding, if not otherwise available. The retrofit program regulations required Maryland to forward to the Administrator 'the text of statutory proposals, regulations, and enforcement procedures' that it submits for adoption.
 
 
 52
 The complications inherent in these astonishing regulations are compounded by 42 U.S.C. § 1857h--5(b)(2) which provides that such actions of the Administrator 'with respect to which review could have been obtained . . . (as it is here) shall not be subject to judicial review in civil or criminal proceedings for enforcement.'
 
 
 53
 In a nutshell, the EPA has directed Maryland and her legislature to legislate under pain of civil and criminal penalties, 42 U.S.C. § 1857c--8, for a State is a person within the meaning of the statute. 42 U.S.C. § 1857h(e). The government does not beg the issue, but boldly takes the position just set forth in its brief as it describes the questioned regulations: 'these EPA regulations which require the State to enact enabling legislation. . . .' It then argues that it is immaterial whether the activity regulated under the commerce clause is proprietary or governmental, see New York v. United States, 326 U.S. 572, 583, 66 S.Ct. 310, 90 L.Ed. 326 (1946), and United States v. California, 297 U.S. 175, 183, 56 S.Ct. 421, 80 L.Ed. 567 (1936), and that a construction of the commerce clause which does not include the power of the United States to direct the legislature of a state to legislate is 'narrow and restrictive.'
 
 
 54
 The EPA takes the position that 'direct federal action' to enforce its own regulations, similar to these, would be 'inefficient and impractical' and that '(i)t is clearly necessary that implementation and transportation control plans be carried out at the State and local level.' 38 Fed.Reg. 30633 (November 6, 1973).
 
 
 55
 But we do not agree with the Agency that the issue presented is not of unusual constitutional significance. Rather, we are of the opinion that it is. The Supreme Court 'has always recognized that the power to regulate commerce, though broad indeed, has limits.' Maryland v. Wirtz, 392 U.S. 183, 196, 88 S.Ct. 2017, 2024, 20 L.Ed.2d 1020 (1968). In New York v. United States, the Court emphasized that '(u)sual governmental functions . . . are immune from federal taxation in order to safeguard the necessary independence of the state.' 326 U.S. at 580, 66 S.Ct. at 313. It went on to note that '(t)here are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations.' Id. at 582, 66 S.Ct. at 314. It is doubtless true that the imposition of a burden upon a state by Congress in the exercise of its power under the commerce clause, even though the burden be onerous and unexpected, does not render the federal action invalid. See, e.g., Maryland v. Wirtz, supra; New York v. United States, supra; United States v. California, supra; Parden v. Terminal Railway, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). But it is yet true, as it was at the time of the first great exposition of the breadth of the commerce clause, that '(a) lthough many of the powers, formerly exercised by the states, are transferred to the government of the Union, yet the state governments remain, and constitute the most important part of our system.' Gibbons v. Ogden, 9 Wheat. 1, 197, 6 L.Ed. 23 (1824).[7]
 
 
 56
 And, while it may be true that some, or even many, of the attributes of state sovereignty have been diminished by the exercise by Congress of the broad rights accorded the nation under the commerce clause, it is equally true that if there is any attribute of sovereignty left to the states it is the right of their legislatures to pass, or not to pass, laws. As the Court stated in In re Duncan, 139 U.S. 449, 11 S.Ct. 573, 35 L.Ed. 219 (1891):
 
 
 57
 'By the constitution, a republican form of government is guaranteed to every state in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies . . ..' 139 U.S. 449, 461, 11 S.Ct. 573, 577, 35 L.Ed. 219.
 
 
 58
 Not far afield is the rejection by the Philadelphia Convention of Charles Pinkney's constitutional plan which would have enabled Congress to 'revise,' 'negative,' or 'annul' the laws of a state. See Elliot's Debates (Michie Ed., Vol. I, Book I, pp. 149, 400--01).
 
 
 59
 If the national legislature may not revise, negative or annul a law of a state legislature, how an Act of Congress may be construed to permit an agency of the United States to direct a state legislature to legislate is difficult to understand.
 
 
 60
 We have found no appellate case save one, Pennsylvania v. EPA, 500 F.2d 246 (3rd Cir. 1974), which may be construed as holding that the nation may direct the legislature of a state to act, for it is one thing to strike down a state law under the supremacy clause, or to decide that a state which chooses to engage in activities which Congress has a right to control must do so on Congress' terms, or to hold that Congress may induce a state to act by offering favors or exacting financial penalties if it does not, but it is quite another thing to extract from a state a most fundamental attribute of its sovereignty. 'The Court has ample power to prevent what the appellants purport to fear, 'the utter destruction of the State as a sovereign political entity." Maryland v. Wirtz, 392 U.S. at p. 196, 88 S.Ct. at p. 2024.
 
 
 61
 We, therefore, do not consider the problem routine, or one which we should meet directly absent the most compelling circumstances. With the Fifth Circuit, we are of opinion the question is weighty. Texas v. EPA, 499 F.2d 289, 320 (5th Cir. 1974). We are, of course, aware that in Pennsylvania v. EPA, 500 F.2d 246 (3rd Cir. 1974), that court approved an EPA imposed plan with many of the features here claimed objectionable. But it is also true that the First Circuit in Natural Resources Defense Council v. EPA, 478 F.2d 875 (1st Cir. 1973), described as 'difficult to imagine . . . (the) sort of guarantee the current Rhode Island executive or legislature could give the E.P.A. to insure that adequate resources would be devoted to the Plan.' Id. at 883--84. This was so 'given the mechanics of state-federal relations,' id. at 883, and its opinion that while '(s)uch assurances might have a symbolic effect; however, they would have little more, since a governor or even a present session of the legislature cannot make binding commitments on behalf of their successors, nor would such representations seem to be enforceable.' Id. at 884.
 
 
 62
 Of equal significance is the recent decision of the Ninth Circuit in Brown v. EPA, 512 F.2d 827 (9th Cir. 1975). There, the court was faced with similar EPA regulations directing the State of California to take certain affirmative actions to insure the attainment of ambient air quality standard. It, too, was of the opinion that in enacting the Clean Air Act, Congress did not intend 'to make the states departments of the Environmental vironmental Protection Agency no less obligated to obey its Administrator's command than . . . its (subordinates).' P. 835. Thus, it interpreted the Act accordingly.
 
 
 63
 While not reaching the constitutional issues raised by the EPA's claimed authority, the court, nevertheless, felt compelled to suggest its general evaluation of these issues so as to 'reveal the intensity of (their) desire to avoid confronting them.' P. 837. In so doing, the court noted that acceptance of the broad interpretation of the Commerce Clause which the EPA urged was appropriate 'would reduce the states to puppets of a ventriloquist Congress.' Id. at 839. The court refused to attribute to Congress any such purpose unless it was expressed unequivocally. This, in its view, was not done in the Clean Air Act.
 
 
 64
 And, also in point is our language in Appalachian Power Co. v. EPA, 477 F.2d 495 (4th Cir. 1973), where, in discussing the rejection of a state plan by the EPA under this statute, we said:
 
 
 65
 '(I)f . . . (the Administrator) finds it (the plan) reasonably unlikely to achieve such results within fixed time-tables, whether for technological or economic reasons, or otherwise, he should reject the plan and return it to the state authorities with instructions to consider alternative procedures that might meet the statutory requirements as established by the Administrator.' 477 F.2d 495, 506.
 
 
 66
 So, far from believing the regulations are plainly valid, we are of opinion their constitutional validity is very doubtful at the very best, and refrain from ruling on their validity only because of two canons of construction which, in the exercise of proper restraint and constitutional limitations, courts should use in construing an Act of Congress. The first of these is that given a valid and invalid construction, courts should, when possible, construe the statute as valid. Graham v. Richardson, 403 U.S. 365, 383, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The second is that if a case can be decided on either of two grounds one involving a constitutional question, and the other, a question of statutory construction or general law, the court should decide on the basis of the latter. Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Justice Brandeis concurring); Alma Motor Co. v. Timken Co., 329 U.S. 129, 136, 67 S.Ct. 231, 91 L.Ed. 128 (1946).
 
 
 67
 The statute itself in pertinent part provides that a state shall 'submit . . . a plan' to comply with the statutory mandate (and achieve the goals set out therein), 42 U.S.C. § 1857c--5(a)(1), and the Administrator shall 'approve or disapprove such plan,' 42 U.S.C. § 1857c--5(a)(2). To merit approval, the plan must contain the 'necessary assurances that the State will have . . . authority to carry out such implementation plan.' 42 U.S.C. § 1857c--5(a) (2)(F). If an implementation plan submitted by a state is 'determined by the Administrator not to be in accordance with the requirements' of the statute, the Administrator 'shall . . . promptly prepare and publish proposed regulations setting forth an implementation plan, or a portion thereof, for a State.' 42 U.S.C. § 1857c--5(c)(1). As is seen from the table appended hereto, part of the Maryland plan was approved and part was disapproved. So far as we are presently concerned, such disapproval was based on a lack of authority.
 
 
 68
 Instead of referring the matter back to the state to 'consider alternative procedures that might meet the statutory requirements,' Appalachian Power at 506, the EPA imposed its own plan for Maryland. Assuming the EPA has the right to impose such a plan on Maryland under 42 U.S.C. § 1857c--5(c)(1), having once found Maryland's proposal lacking in authority, we find nothing in the statute which authorizes the Administrator to direct the state of supply 'legal authority,' or 'statutory proposals' or the like for the 'assurances' offered to the Administrator. The statute in plain words authorizes the Administrator to 'prepare . . . regulations . . . for a State;' it does not empower him to direct a state to enact its own statutes and regulations as prescribed by the Administrator. In our opinion, the preparation of regulations for a state means regulations to be applied within the boundaries of a state if it does not act in a manner approved by the EPA. The fact that the EPA may prepare regulations for a state 'to consider', Appalachian Power at 506, implies no authority to order Maryland to legislate, 'submit legally adopted regulations,' etc.
 
 
 69
 The EPA argues that federal administration of the federal law will be 'inefficient and impractical', and that the same may be better administered by the states. Assuming this to be true, and assuming the debates of Congress cited by the Agency support this contention, and accepting the stated intent of the statute that the control of air pollution remains the primary responsibility of the state and local governments, we still find nothing in any of them which indicates the statute should be construed with such sweeping breadth as the government claims. We are of opinion that constitutional principles may not be violated for administrative expediency, Thompson v. Smith, 155 Va. 367, 379, 154 S.E. 579 (1930), and the acceptance or rejection of hordes of federal employees enforcing an EPA plan for Maryland, as argued by the EPA, unpalatable as that may be, in a political judgment entrusted by the Constitution to the Maryland General Assembly and the State of Maryland.
 
 
 70
 We acknowledge that the construction of a statute by the agency administering it is to be accorded great weight. See, e.g., Social Security Board v. Nierotko, 327 U.S. 358, 368, 66 S.Ct. 637, 90 L.Ed. 718 (1946). But if the acts of the administering agency are not in accordance with law, its actions must be set aside. 5 U.S.C. § 706.
 
 
 71
 It should be noted that many forms of pressure on the states have been held not to violate those rights reserved by the Tenth Amendment, and none of them have been included in this statute. The alternative whip of economic pressure and seductive favor was approved in Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937) (unemployment tax); Oklahoma v. Civil Service Comm'n, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1937) (withholding of highway funds conditioned on removal of a member of the highway commission of state); Vermont v. Brinegar, 379 F.Supp. 606 (D.Vt.1974) (highway funds withholding for non-compliance with Highway Beautification Act); and many other cases. Statutes are common which invite state regulation or administration in lieu of federal control, see 49 U.S.C. § 1671 et seq., on National Gas Pipeline Safety; or which withhold federal aid for failure to comply with federal standards, see P.L. 92--239, withholding federal approval of highway projects for states which have a speed limit of more than 55 m.p.h.; or making federal grants for state plans invoking federal standards, Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. And it should be noted, as did the Fifth Circuit in Texas v. EPA at 320, that no similar available administrative alternatives have been proposed by the EPA in this case. The EPA has simply construed the statute to suit its administrative convenience with a direction to Maryland to perform, leaving no alternative. Maryland could not, as Oklahoma did in Oklahoma v. Civil Service Comm'n, 330 U.S. 127, 143, 67 S.Ct. 544, 554, 91 L.Ed. 794 (1946), 'adopt the 'simple expedient' of not yielding.' Moreover, the statute itself, 42 U.S.C. § 1857h--5(b)(2), provides that Maryland must litigate now or forfeit the defense later.
 
 
 72
 Has Congress abandoned its time honored and constitutionally approved device of threat and promise? We think not. The statute here tells the States to devise implementation plans conforming to federal specifications or else the EPA will promulgate its own plan. The threat is a federally imposed regulation with federal administration; the promise is the invitation for Maryland to enact a suitable implementation plan and administer it with state employees, thus avoiding federal interference. Nothing in the statute presently brought to our attention should prevent the EPA from, for example, promulgating substantive regulations and inviting Maryland to administer them upon proper 'assurances' by Maryland as required by the statute.
 
 
 73
 But in the promulgation of its own plan, the EPA may not, under the statute, direct Maryland to act in the manner and form prescribed under these regulations. This would be construing the statute to have a breadth Congress never intended. Inviting Maryland to administer the regulations, and compelling her to do so under threat of injunctive and criminal sanctions, are two entirely different propositions. We are thus of the opinion, and so hold, that the EPA was without authority under the statute, as a matter of statutory construction, to require Maryland to establish the programs and furnish legal authority for the administration thereof.
 
 VI
 Conclusions
 
 74
 From what has been said, it is apparent that we must decline to approve parts of the EPA plan for Maryland. The State of Maryland asserts without contradiction that as a result of the amendment to the statute providing for the clean car, the plan as presently devised will require 56% gasoline rationing by 1977. It requests, therefore, that the entire matter be reconsidered by the Agency. The economic and social consequences of such restrictions on a community of hundreds of thousands are impossible to predict and it would be an understatement to say they will be immense. The EPA apparently does not especially oppose this approach, although nothing in its brief may be construed as acquiescence. But we must consider that Congress has set deadline dates for attainment of the statutory goals and those parts of the Maryland plan not reviewed are a beginning on a very complex problem.
 
 
 75
 In view of the advice we have received from the EPA that the Congressional amendment to the clean car program 'has a serious impact on the capability of the transportation control plans to attain ambient air quality standards by May 31, 1977,' especially when coupled with the fact that catalytic converters may be discharging sulfuric acid emissions into the atmosphere, the EPA may wish to reconsider the entire program for Maryland. This, however, is a matter the Administrator should decide.
 
 
 76
 We will, then, set out specifically the regulations with respect to which we take action.
 
 
 77
 40 CFR § 52.1105, employer provisions for mass transit priority incentives, is remanded to the EPA for action not inconsistent with this opinion.
 
 
 78
 40 CFR § 52.1111, management of parking supply, having been suspended indefinitely, with the right of review reserved, the petitions for review are dismissed from the active docket of this court, without prejudice, and with leave to reinstate the same for good cause shown.
 
 
 79
 40 CFR § 52.1112, control and prohibition of photochemically reactive organic materials, the regulation having been rescinded, the petitions are dismissed as moot.
 
 
 80
 40 CFR § 52.1102, control of evaporation losses from vehicular tanks, this regulation is remanded to the Administrator for action not inconsistent with this opinion, although jurisdiction of the matter is retained. For purposes of further action by this court, the petition of Bethlehem Steel, in case No. 74--1064, as it may concern 40 CFR § 52.1102, is consolidated with the petitions of Texaco, No. 74--1011, and Gulf, No. 74--1052.
 
 
 81
 40 CFR § 52.1097, oxidation catalyst retrofit program for light and medium duty vehicles. Since EPA advises the regulation is being rescinded, the petition is dismissed as moot, without prejudice to reinstate the same or file another petition should we be mistakenly advised.
 
 
 82
 40 CFR § 52.1095, inspection and maintenance program, 52.1096, vacuum spark advance disconnect retrofit program, 52.1098, light duty air/fuel control retrofit program, 52.1100, heavy duty air/fuel control retrofit program, and 52.1106, study and establishment of bikeways program, are all set aside as contrary to law.
 
 
 83
 40 CFR § 52.1080, compliance schedule. In the prayer of the petition, Maryland asked for the first time to have this regulation set aside. The regulation covers a multitude of subjects from boilers to bus lanes and no attempt was made to enlighten us as to the specific defects claimed. Accordingly, the petition for review as to § 52.1080 is dismissed without prejudice to reinstate the same for good cause shown.
 
 APPENDIX
 
 84
 Table 1. - E.P.A. TRANSPORTATION CONTROL PLAN
-------------------------------------------------------------------------------
 Maryland plan EPA proposal EPA promulgation
-------------------------------------------------------------------------------
 STATIONARY SOURCE CONTROLS
-------------------------------------------------------------------------------
Service station tank Service station Service station tank vapor
 vapor recovery. tank vapor recovery.
 recovery.
Service station pump Service station Service station pump vapor
 vapor recovery. pump vapor recovery.
 recovery.
Control of dry cleaning Control of dry Control of dry cleaning losses.
 losses. cleaning losses.
Limitation of major Control of organic Limitation of major source
 source emissions. solvents. emissions.
Prohibition of new major
 sources.
-------------------------------------------------------------------------------
 MOBILE SOURCE CONTROLS
-------------------------------------------------------------------------------
Inspection-maintenance. Inspection- Inspection-maintenance.
HDV catalytic retrofit. maintenance HDV air-fuel control retrofit.
 VSAD retrofit, VSAD retrofit, pre-68 LDV.
 pre-68 LDV.
 LDV catalytic LDV catalytic retrofit.
 retrofit.
 LDV air-fuel control retrofit.
 MDV catalytic retrofit.
 MDV air-fuel control retrofit.
-------------------------------------------------------------------------------
 VMT CONTROLS
-------------------------------------------------------------------------------
Transit service
 improvements.
Carpool locator. Carpool locator.
Express busways. Exclusive Exclusive busways.
 buslanes.
 Limitation of Limitation of onstreet
 onstreet parking.
 parking.
Traffic flow Traffic flow improvements.
 improvements.
Episode vehicle Management of parking supply.
 exclusion.
 Employer's parking policy.
 Study and establishment of
 bike-ways.
 Gasoline Gasoline distribution
 distribution limitations.
 limitation.
TABLE 2--COMPILATION OF CONTROL STRATEGY EFFECTS FOR THE METROPOLITAN BALTIMORE
 INTRASTATE AIR
 QUALITY CONTROL REGION ON MAY 31, 1977
-------------------------------------------------------------------------------
 Carbon monoxide Hydrocarbons
 ------------------ ------------------
 Tons Percent Tons Percent
 per of per of
 Year base year peak base year
 period
-------------------------------------------------------------------------------
1972 ton per year (base year) .......... 592,737 100.0 61.0 100.0
Reduction required to reach NAAQS ...... 337,860 57.0 42.7 70.0
-------------------------------------------------------------------------------
 STATIONARY SOURCES
-------------------------------------------------------------------------------
Emissions without control strategy ..... 103,300 17.4 13.5 22.1
Expected reduction from existing
 regulations:
 (a) Solvent control ..................................... 0.85 1.4
 (b) Gasoline handling vapor recovery
 (bulk) ................................................... 1.0 1.6
 (c) Drycleaning emissions control ....................... 0.3 0.6
 (d) Aircraft ground operations .......................... -0.18 -0.3
 (e) Net result of industrial growth .. -5,575 -0.9 -0.17 -0.3
Promulgated stationary source controls
 (a) Control and prohibition of major
 sources .................................................. 0.52 0.9
 (b) Gasoline handling vapor recovery
 (stage I) ................................................ 0.57 0.9
 (c) Gasoline handling vapor recovery
 (stage II) ............................................... 0.95 1.6
Stationary source emissions remaining .. 108,875 18.4 9.57 15.7
-------------------------------------------------------------------------------
 MOBILE SOURCES
-------------------------------------------------------------------------------
Emissions from LDV's, MDV's, and HDV's
 without control strategy .............. 489,437 82.6 47.5 77.9
Expected reductions:
 (a) Federal motor vehicle control
 program * ............................ 156,437 26.4 18.7 30.7
 (b) Inspection and maintenance
 (LDV,MDV) ............................. 23,710 4.0 2.23 3.7
 (c) VSAD retrofit, pre-1968 LDV's ..... 1,656 0.3 0.29 0.5
 (d) Air-fuel retrofit, 1968-1971
 LDV's ................................. 26,491 4.5 0.80 1.3
 (e) Catalytic retrofit, 1971-1975
 LDV, MDV .............................. 58,681 9.9 3.38 5.5
 (f) Air-fuel retrofit, pre-1974
 MDV's .................................. 2,916 0.5 0.22 0.4
 (g) Air-fuel retrofit, HDV's ......... 26,512 4.5 1.38 2.3
 (h) Traffic flow improvements ......... 3,065 0.5 2.61 4.3
 (i) VMT measures:Exclusive buslanes,
 carpool locator, bikeway
 program, parking restrictions .... 2,734 0.5 0.43 0.7
 (j) Gasoline distribution
 limitations ........................... 78,381 13.2 8.73 14.3
Mobile source emissions remaining ...... 108,854 18.4 8.73 14.3
 --------------------------------------
 Total reductions ................. 375,008 63.3 42.7 70.0
 --------------------------------------
 Total emissions remaining ........ 217,729 36.7 18.3 30.0
 Total allowable emissions ........ 254,877 43.0 18.3 30.0
-------------------------------------------------------------------------------
* Includes effect of VMT growth.
 
 
 
 *
 United States District Judges for the Eastern District of Virginia; sitting by designation
 
 
 [1]
 Section 1857h--5(b)(1) provides in relevant part:
 A petition for review of action of the Administrator . . . in approving or promulgating any implementation plan under section 1857c--5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit.
 
 
 [2]
 It is provided in § 1857c--5(c) that:
 (1) The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if--
 (B) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section.
 
 
 [3]
 42 U.S.C. § 1857g states:
 (a) The Administrator is authorized to prescribe such regulations as are necessary to carry out his function under this chapter. . . .
 
 
 [4]
 The private parties originally joined in this action are Sears, Roebuck & Co., General Motors Corp., Montgomery Ward & Co., Inc., J. C. Penney Co., Inc., May Dept. Stores Co., Adcor Realty Corp., Texaco, Gulf, Safeway Stores, and Bethlehem Steel Corp. The Texaco and Gulf cases have been deferred by agreement. Adcor Realty Corp., and Associated Dry Goods Corp., have dismissed their petitions without prejudice
 
 
 [5]
 Section 52.1105 suggests that the program may be adequate if it contains 'provisions for subsidies to employees who use mass transit, reductions in the number of employee parking spaces, or surcharges on the use of such spaces by employees, provision of special charter buses or other modes of mass transit, preferential parking and other benefits to employees who travel to work by carpool and/or any other measures acceptable to the Administrator.' (Italics added)
 
 
 [6]
 The Administrative Procedure Act defines rulemaking as the 'agency process for formulating, amending, or repealing a rule.' 5 U.S.C. § 551(5). A 'rule' is defined as:
 (T)he whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . .. 5 U.S.C. § 551(4).
 
 
 [7]
 This case rejected an analogy between the taxing power and the commerce power. 9 Wheat. 1, 199, 6 L.Ed. 23