# Congressional Authority to Require the States to Lodge Federal Pre-Trial Detainees

Congress has power to provide for the housing of federal pre-trial detainees, whether by authorizing the construction of federal facilities or arranging with the states to use state facilities; however, it does not follow that Congress could require unwilling states to house federal prisoners, particularly where state reluctance stems from overcrowding in state and local detention facilities.

The Tenth Amendment limits Congress' power to enact legislation which interferes with the traditional way in which local governments have arranged their affairs; moreover, principles of federalism limit Congress' power to require state officers to perform federal functions.

Historically, Congress has been reluctant to require states to house federal prisoners, although it is not clear whether this reluctance has been motivated by a belief that Congress lacked power to do so by political considerations.

A statutory scheme by which Congress would induce, rather than coerce, the states to house federal prisoners through exercise of its spending power is more likely to be held constitutional, although here too there are limits on Congress' power to impose coercive conditions on the states' receipt of federal funds.

May 18, 1981

## MEMORANDUM OPINION FOR
## THE ASSOCIATE ATTORNEY GENERAL

This responds to your request for an opinion whether Congress would have the authority under the Constitution to enact legislation requiring state and local jail authorities to lodge federal pre-trial detainees for a fee to be established either by regulation or agreement. We are concerned that recent decisions of the U.S. Supreme Court make it more likely than not that the courts would hold such legislation to be too intrusive on the states' sovereignty and therefore unconstitutional under the Tenth Amendment. We suggest you consider devising a legislative scheme which would induce, rather than coerce, the states to offer their facilities to house federal pre-trial detainees.

There is no question that Congress has the power under the Constitution to provide for the housing of federal pre-trial detainees—whether by authorizing the construction of dentention facilities or arranging with the states to use their facilities. *Ex parte Karstendick*, 93 U.S. (3 Otto) 396, 400 (1876). Although this power is not expressly enumerated in Article I, § 8 of the Constitution, the exercise of such power is necessary and proper, under Article I, § 8, clause 18, to provide for an

142

orderly federal system of criminal justice contemplated by several other provisions of the Constitution. *See, e.g.,* Art. II, § 3; Art. III, § 2, cl. 3; Fifth Amendment; Sixth Amendment; Eighth Amendment. That power, however, does not necessarily authorize Congress to require unwilling states to provide facilities to house federal pre-trial detainees, because the Supreme Court has recognized that Congress' exercise of its constitutional power is limited by the Tenth Amendment.

The landmark case discussing the Tenth Amendment's limitations on Congress' exercise of its constitutional powers is *National League of Cities* v. *Usery,* 426 U.S. 833 (1976). In *National League of Cities,* the Court addressed the question whether Congress, in exercising its power under the Commerce Clause, could extend coverage of the Fair Labor Standards Act to employees of the states and their political subdivisions, thus requiring the states to adhere to minimum wage and maximum hour requirements previously applicable only to private employers. While recognizing that Congress has the power under the Commerce Clause to impose such restrictions on private employers, the Court held that the Tenth Amendment limits the exercise of otherwise plenary powers of Congress under the Commerce Clause when the exercise of those powers would impermissibly intrude upon traditional state governmental functions:

> It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States. We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner.

*Id.* at 845.

The Court concluded that, since application of the Fair Labor Standards Act to employees of states and their political subdivisions would "significantly alter or displace the States' abilities to structure employee-employer relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation," *id.* at 851—areas in which the states have traditionally provided services to their citizens—Congress lacked authority to extend the coverage of the Act to such employees. In a concurring opinion, Justice Blackmun, who joined the Court's opinion and whose vote was necessary to form the Court majority, appeared to temper the Court's opinion by reading

143

it to permit federal intrusion on state sovereignty "where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential." *Id.* at 856. Four Justices dissented from the Court's decision.

In our view, regardless of whether the language of the Court's opinion is taken literally or whether the "balancing approach" as articulated by Justice Blackmun is applied, the proposed legislation for mandatory incarceration of federal pre-trial detainees in local detention facilities would present serious problems under the Tenth Amendment. The opinion focuses on interference with local government policies and traditional state governmental functions and the displacement of local policy decisions. It is clear that the administration of a jail is a traditional state governmental function. *Wentworth* v. *Solem,* 548 F.2d 773 (8th Cir. 1977). *Cf. Johnson* v. *Avery,* 393 U.S. 483, 486 (1969) ("There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene."). *Meachum* v. *Fano,* 427 U.S. 215, 229 (1976) ("The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the states.").

In reaching our conclusion, we recognize that it could be argued that *National League of Cities* is not applicable to the proposal in question here because the proposed legislation, assuming that it would not also direct the states in the administration of their pre-trial detention facilities, would not directly usurp the decisionmaking functions of the states in the administration of their prison facilities. We are not convinced, however, that legislation must directly supplant state decisionmaking to run afoul of the principles of *National League of Cities.* It is clear from the opinion that the Court was concerned primarily with the effect of legislation on "the traditional ways in which the local governments have arranged their affairs." 426 U.S. at 849. If, as noted in your request, this legislation is necessary because state and local governments are refusing to continue contracting to house federal pre-trial detainees because of overcrowding, a requirement that they provide facilities, regardless of the overcrowding of state and local facilities, may force the states, even with some statutory fee provided, to reallocate their facilities or at worst either to detain fewer persons or to construct more detention facilities.[1] The proposed legislation might then be regarded as interfering substantially, though arguably less directly than the legislation invalidated in *National League of Cities,* with the states' administration of their prison facilities.

---

[1] The states, with already crowded facilities, would be placed in a particularly difficult position by the proposed legislation because, unless they acted to relieve any overcrowding caused by housing federal pre-trial detainees, they could be found by a federal court to have denied the detainees due process and ordered to eliminate the overcrowding. *See Campbell* v. *Cauthron,* 623 F.2d 503 (8th Cir. 1980). *See also Bell* v. *Wolfish,* 441 U.S. 520 (1979).

144

Moreover, under Justice Blackmun's balancing test, the intrusion may be less justifiable than the intrusion held to be impermissible in *National League of Cities.* The federal interest served by the proposed legislation appears to be primarily that of saving the cost to the federal government of constructing and administering pre-trial detention facilities for its detainees. In cities where there are relatively few federal detainees, it would obviously be more efficient to use existing state facilities than to construct new federal facilities. That interest, however, does not seem to be "demonstrably greater" than the state interest in avoiding further overcrowding of its facilities so as to justfy the intrusion.

There is also a line of cases decided prior to *National League of Cities* which suggests that this proposal could be considered as far more intrusive than imposing wage and hour restrictions on state governments because it imposes an affirmative obligation on the states and their subdivisions to perform a federal function. In *Prigg* v. *Pennsylvania,* 41 U.S. (16 Pet.) 539, 615–16 (1842), and more clearly in *Kentucky* v. *Dennison,* 65 U.S. (24 How.) 66, 107 (1860), the Supreme Court held that, while Congress may delegate the performance of federal functions to state officers, the principles of federalism deprive Congress of the power to *require* state officers to perform such functions:

> Indeed such a power would place every State under the control and dominion of the General Government, even in the administration of its internal concerns and reserved rights. *And we think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it;* for if it possessed this power, it might overload the officer with duties which would fill up all his time, and disable him from performing his obligations to the State, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State.

65 U.S at 107–108 (emphasis added). While the Court has implicitly recognized exceptions to this principle when a specific federal power in the Constitution was clearly intended to intrude upon state sovereignty, *Fitzpatrick* v. *Bitzer,* 427 U.S. 445, 456 (1976) (Fourteenth Amendment); *City of Rome* v. *United States,* 446 U.S. 156, 178–80 (1980) (Fifteenth Amendment), the general principle has not been expressly disavowed

by the Court [2] and continues to be regarded by commentators [3] and lower courts as still viable.

In a series of court of appeals decisions criticizing regulations promulgated by the Environmental Protection Agency (EPA) which would have required states to enact statutes and to administer and enforce EPA programs, three circuit courts criticized those regulations as intruding upon state sovereignty in violation of the Tenth Amendment. In *District of Columbia* v. *Train,* 521 F.2d 971 (D.C. Cir. 1975), the court emphasized that the EPA could not, consistent with the Tenth Amendment, "commandeer the regulatory powers of the states, along with their personnel and resources, for use in administering and enforcing a federal regulatory program against the owners of motor vehicles." *Id.* at 992. *See also Brown* v. *EPA,* 521 F.2d 827, 841 (9th Cir. 1975) *citing Dennison* and *Prigg; Maryland* v. *EPA,* 530 F.2d 215 (4th Cir. 1975). The Supreme Court granted certiorari to review these cases but did not render an opinion on the merits because the Government in its brief conceded the need to modify its regulations. *EPA* v. *Brown,* 431 U.S. 99 (1977).[4]

Finally, there is some historical evidence, which is far from conclusive, that the first and subsequent Congresses may have believed that they were not empowered by the Constitution to require unwilling

[2] Recently, the Supreme Court, in discussing the legislative history of 42 U.S.C. § 1983 in *Monell* v. *New York City Dept. of Social Services,* 436 U.S. 658, 676 (1978), suggested in dictum that a line of cases which included *Dennison* and *Prigg* had not survived as precedent. It is not clear what, if any, weight should be given to that dictum, however, because the Court cited *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 347–48 (1879) as support—a case which held *Dennison* inapplicable because the Fourteenth Amendment expressly gave Congress the authority to interfere with and compel action by state officers in matters covered by the Amendment.

[3] *See* Hart, *The Relations Between State and Federal Law,* 54 Colum. L. Rev 489, 515–17 (1954) ("Taney's statement [in *Dennison*] can stand today, if we except from it certain primary duties of state judges and occasional remedial duties of other state officers. Both exceptions, it will be observed, involve enforcement through the orderly and ameliorating forms of the judicial process. In any event, experience with the exceptions does little to bring into question the principle of the rule.")

[4] Recently, a district court in Mississippi declared unconstitutional provisions in the Public Utility Regulations Policies Act of 1978 (PURPA), Pub. L. No. 95–617, 92 Stat. 3117, which required state regulatory authorities to implement, when appropriate, certain federal standards against utilities. *Federal Energy Regulatory Commission* v *Mississippi,* No. J. 79-212(c) (S.D. Miss. February 27, 1981). FERC and the Department of Energy filed a joint notice of appeal to the Supreme Court on March 13, 1981. As pointed out in the Jurisdictional Statement filed by the Solicitor General in this case and earlier by an opinion of this Office (Memorandum from Deputy Assistant Attorney General Mary C. Lawton to Assistant Attorney General John H. Shenefield dated November 9, 1978), Titles I and III of PURPA permit the states to choose whether to implement the federal standards and, therefore, do not impermissibly intrude on the states' sovereignty. Title II of PURPA is closer to the proposed legislation because it requires state regulatory authorities to implement rules promulgated by FERC, albeit allowing such authorities considerable discretion in deciding how to implement the rules. The Solicitor General argues in his Jurisdictional Statement that, because discretion is permitted in the implementation of the rules, any intrusion on the states' sovereignty is minimal and, in any event, justified by the paramount federal interest in dealing with the energy crisis. Appellant's Jurisdictional Statement at 21–23, *FERC* v. *Mississippi,* No. 80-1749 (October Term, 1980). Although PURPA is different in several respects from the legislation proposed here, Supreme Court review of PURPA may shed some light on the question of what if any obligations to enforce federal law may be imposed on the states. [NOTE: In *FERC* v. *Mississippi,* 456 U.S. 742 (1982), the Supreme Court held that Titles I and III of PURPA were not unconstitutional on Tenth Amendment grounds, finding that they "simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals." 456 U.S. at 765. Ed.]

146

states to house federal detainees.[5] When the federal government was founded, it presumably would have been prohibitively expensive for the new government to provide its own prison facilities to house federal prisoners scattered throughout the original 13 states. Congress dealt with this problem not by *requiring* the states to make their facilities available to the federal government, but by adopting a joint resolution on September 23, 1789, *recommending* "to the legislatures of the several States to pass laws, making it expressly the duty of the keepers of their gaols, to receive and safe keep therein all prisoners committed under the authority of the United States" and authorizing payment to the states for the use of their jails. 1 Stat. 96–97 (1789). The joint resolution passed both Houses of Congress without any recorded debate.[6] Thus, we do not know whether the decision by the first Congress to recommend to the states that they permit the federal government to use their prison facilities, rather than requiring them to provide the facilities, was motivated by a belief that Congress lacked the power to require the latter or that the former was merely politically more acceptable.

Congress' action in 1821, however, when some states apparently refused to permit the federal government to continue to use their prison facilities, lends some support to the inference that the early Congresses believed that they lacked the power to require the states to provide facilities. From a joint resolution adopted by Congress in 1821,[7] it appears that some states, having followed Congress' recommendation in 1789 to permit the use of their prison facilities by the federal government, subsequently decided to withdraw their permission. Congress responded to that withdrawal, not by requiring the states to make their facilities available to the federal government, but by authorizing the marshal, in those states that had withdrawn their permission, to "hire a convenient place to serve as a temporary jail, and to make the necessary provision for the safe keeping of prisoners committed under the authority of the United States, until permanent provision shall be made by law for that purpose." 3 Stat. 646–47 (1821). *See also* 4 Stat. 118 (1825) and 4 Stat. 777 (1835) (authorizing the courts to order execution

---

[5] If such a belief were expressed clearly, which it is not, it would be considered a contemporaneous construction of the Constitution, followed since the founding of the government, and entitled to great weight in determining the scope of Congress' power. *Cf. Ex parte Quirin,* 317 U S. 1, 41–42 (1942), *Williams* v *United States,* 289 U S. 553, 573–74 (1933)

[6] 1 Debates in Congress, 86, 938 (Gales & Seaton eds 1789).

[7] *Resolved by the Senate and House of Representatives of the United States of America, in Congress assembled.* That where any state or states, having complied with the recommendation of Congress, in the resolution of the twenty-third day of September, one thousand seven hundred and eighty-nine, shall have withdrawn, or shall hereafter withdraw, either in whole or in part, the use of their jails for prisoners committed under the authority of the United States, the marshal in such state or states, under the direction of the judge of the district, shall be, and hereby is, authorized and required to hire a convenient place to serve as a temporary jail, and to make the necessary provision for the safe keeping of prisoners committed under the authority of the United States, until permanent provision shall be made by law for that purpose; and the said marshal shall be allowed his reasonable expenses, incurred for the above purposes, to be paid out of the Treasury of the United States. Act of March 3, 1821, 3 Stat. 646–47 (1821).

of prison sentences in state prisons where "the use of which shall be allowed and authorized by the legislature of the state for such purposes."); 13 Stat. 74-75 (1864) (authorizing the Secretary of the Interior to contract with state authorities for the use of prison facilities for persons convicted of federal crimes in the territories); 13 Stat. 500 (1865) (authorizing courts to order execution of prison sentences longer than 1 year in state prisons where use of the prison is authorized by the state legislature). Again, there is nothing in the legislative history to indicate that Congress believed that it lacked power to require the recalcitrant states to make their facilities available to the federal government; Congress may have been merely reluctant to exercise this power. Thus, we cannot conclude on the basis of this history that the Tenth Amendment precludes such a requirement, but we believe it provides some insight into the sensitive manner with which this issue has been treated by Congress since the founding of our government.

Therefore, while we cannot be certain that the proposed legislation would be unconstitutional, we believe that it would raise a serious question under the Tenth Amendment whether Congress, on enacting such legislation, had impermissibly intruded upon the states' sovereignty. We suggest that you consider, as an alternative, a statutory scheme which would induce, rather than coerce, the states to cooperate in making their detention facilities available to the federal government. Congress, by invoking its power under the Spending Clause, could condition the availability of some grant program to individual states on the cooperation of the states in providing detention facilities for federal pre-trial detainees. Such legislation should, however, be carefully formulated because the Court has recently reaffirmed its warning that "[t]here are limits on the power of Congress to impose conditions on the States pursuant to its Spending Power." *Pennhurst State School and Hospital* v. *Halderman,* 451 U.S. 1, 17 n. 13 (1981).[8] However, if the legislation is not coercive and would contemplate that the states would receive benefits reflecting the incremental costs (including costs attributable to administrative and capital costs) of housing the federal detainees in state facilities, the burden and coercive effect on the states should not be considered excessive and such legislation would probably be upheld. I would imagine that there are already federal subsidies to state prison facilities, and it might be feasible to condition receipt of a portion of such subsidies on the willingness to provide facilities (for compensation) for federal pre-trial detainees. If you would like to

---

[8] For example, statutory inducements cannot be used as "weapons of coercion, destroying or impairing the autonomy of the states." *Steward Machine Co.* v. *Davis,* 301 U.S. 548, 586 (1937)

consider such an approach, we will be happy to assist further with the formulation of such legislation.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*