**FRIENDS OF THE EARTH et al., Plaintiffs,**

**v.**

**Hugh L. CAREY et al., Defendants.**

**No. 74 Civ. 4500.**

United States District Court,
S. D. New York.

July 13, 1976.

Ross Sandler, David Schoenbrod, David Hawkins, Natural Resources Defense Council, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for New York State defendants by Paul S. Shemin, Asst. Atty. Gen., New York City, of counsel.

W. Bernard Richland, Corp. Counsel for City of New York, New York City, for New York City defendants by Alexander Gigante, Jr., Nina Gershon Goldstein, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant Train by Anne Sidamon-Eristoff, William R. Bronner, Asst. U. S. Attys., J. Kevin Healy, Atty., EPA Region II, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

### I. INTRODUCTION

This citizen suit pursuant to § 304 of the Clean Air Act (42 U.S.C. § 1857h–2) seeks to compel New York State and New York City to enforce the Metropolitan Transportation Control Plan (TCP) which was submitted by the Governor to the Administrator of the Environmental Protection Agency (EPA), approved by the Administrator (38 Fed.Reg. 1560–61), and approved by the Second Circuit.[1]

On the appeal of an earlier decision of this Court the Court of Appeals directed the entry of summary judgment against the defendants on four of the strategies contained in the TCP.[2] Partial summary judgment was then entered by this Court and the City defendants' then-pending motion

to dismiss was denied without prejudice to its renewal should the Court of Appeals thereafter alter its holding.

Thereafter, the Court of Appeals denied the City's motion for rehearing

"without prejudice to consideration by [the district court] . . . of constitutional issues not decided prior to the entry of [the Court of Appeals' order] . . . and without prejudice to the right of defendants to move in [the district court] . . . to set aside the order [of partial summary judgment] . . . on the aforesaid constitutional grounds."

The City defendants have now moved to vacate the partial summary judgment previously entered against them and for summary judgment in their favor against the plaintiffs. The grounds for this motion focus on the alleged 10th amendment infirmities inherent in plaintiffs' construction of the citizen's suit provision of the Act (§ 304, 42 U.S.C. § 1857h–2) or, in the alternative, on the alleged constitutional infirmity of that section should the plaintiffs' interpretation prevail.[3]

### II. JURISDICTION

■ The plaintiffs contend that I am without jurisdiction to consider these arguments. It is their position that the City has waived its right to raise these arguments by failing to raise them before the Court of Appeals within 30 days of the Administrator's approval of the TCP. Section 307(b)(1) (42 U.S.C. 1857h–5(b)(1) of the Act requires that any review of the Administrator's action in approving or promulgating a plan be sought in the appropriate Court of Appeals within 30 days of the Administrator's approval or promulgation of the plan. Accordingly, it is argued that the City's

---

1. *Friends of the Earth v. EPA*, 499 F.2d 1118 (2d Cir. 1974).

2. The four strategies are B–1C: Selective Ban on Taxi Cruising; B–3: Reduction of Parking Spaces in the Central Business District; B–7: Imposition of Tolls on all East River and Harlem River Bridges, and D–3: After hours delivery to stores and office buildings.

3. The three cases on which the City primarily relies and which were the basis of its application to the Court of Appeals are: *District of Columbia v. Train*, 172 U.S.App.D.C. 311, 521 F.2d 971 (1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); *Maryland v. EPA*, 530 F.2d 215 (4th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976).

argument is made too late and in the wrong forum. Therefore, it is urged, the City may not raise this question as a defense to a civil enforcement suit. Section 307(b)(2), 42 U.S.C. § 1857h–5(b)(2).

Plaintiffs are clearly correct that the 30 day limitation is to be strictly enforced. See *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Oljato Chapter of Navajo Tribe v. Train*, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975).

However, the plaintiffs mistake the nature of the City's motion. The motion does not seek to challenge the action of the Administrator in approving the TCP; rather, it challenges the interpretation of § 304 by plaintiffs and is properly raised in this proceeding.[4] Moreover, as noted above, the

---

**4.** See *Brown*, 521 F.2d at 831; *Maryland*, 530 F.2d at 224.

The *Brown* and *Maryland* cases held that the challenges to the power of the Administrator were properly raised in the Court of Appeals on the petition for review of the plan. Failure to make such timely challenges would, the courts held, have precluded their use as a defense in a suit under § 113(b). See § 307 (b) (2) (42 U.S.C. § 1857h–5(b) (2)). However, those challenges were to the actual terms of plans promulgated by the Administrator, whereas hare the challenge is to the interpretation of the Act urged by plaintiffs. There has been no discussion by the parties of 40 C.F.R. § 52.23 which purports to describe the Administrator's enforcement powers. This regulation was partially invalidated in *Brown* (521 F.2d at 831). The parties here appear to concede, quite rightly, that the regulation is of no consequence in the case at hand.

This is true firstly because this is a citizen's suit which is in no way affected by the Administrator's description of what he believes his own powers to be. Furthermore, 40 C.F.R. § 52.23 which was promulgated after the TCP was approved did not, as initially promulgated, have any consequences for Administrator-approved plans. See 38 Fed.Reg. 30633 (Nov. 6, 1973). That this is so is spelled out in *Commonwealth of Pennsylvania v. EPA*, 500 F.2d 246, 254 (3d Cir. 1974) where the court explained that this regulation was applicable to plans which the Administrator himself had promulgated in the place of inadequate state plans. The EPA subsequently amended this regulation to extend its intended application to approved plans. 39 Fed.Reg. 33512 (Sept. 18, 1974). According to its publication in the Federal Register, the amended regulation was pursuant to 42 U.S.C. § 1857g(a). That section authorizes the Administrator "to prescribe such regulations as

---

Court of Appeals in its denial of the City's motion to rehear, endorsed the City's right to make the present motion. While that Court expressed no view on the merits of the City's claim, it was sufficiently apprised of the nature of the claim and the plaintiffs' position with respect to the jurisdictional argument that endorsement of the City's right to make the present motion must be read as an indication that it believed the district court to have jurisdiction to consider the motion.[5]

## III. THE MERITS

Section 304(a) (42 U.S.C. § 1857h–2(a)) of the Act provides in pertinent part that:

" . . . any person may commence a civil action on his own behalf—

are necessary to carry out his functions . . . ." Regulations pursuant to this section are not included in those actions which, under 42 U.S.C. § 1857h–5(b)(1), must be challenged within 30 days. Moreover, since the Administrator, in promulgating the amended regulation, dispensed with the procedures of the Administrative Procedure Act (see 39 Fed.Reg. 33512), the defendants would have had no opportunity until now to be heard with respect to this regulation.

In any case, as noted above, the parties have not raised this issue and apparently concede that it has no application to this case.

**5.** This same reasoning necessarily disposes of plaintiffs' argument that the Court of Appeals' past statements that the plan was "enforceable" precludes consideration of the City's motion. See *Friends of the Earth v. EPA*, 499 F.2d 1118 (2d Cir. 1974); *Friends of the Earth v. Carey*, 535 F.2d 165 (2d Cir. 1976).

This is especially true since the Court of Appeals' language can be read consistently with the construction of the Act which I have reached. That is, that the substance of the plan itself is at this point unassailable by defendants, but that its enforcement or implementation must be carried out by the Administrator himself. This is so because the Act only permits suit against the defendants for their polluting activities, but not to compel them to enforce the plan affirmatively against citizen-polluters. This construction is harmonious with the Court of Appeals' language that the TCP is "enforceable." Under the construction I have reached, the enforceability of the TCP is undisturbed. The only questions presented are: Who must enforce the plan and against whom may it be enforced?

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such standard or limitation. . . ."

The City argues that it is not a "person" who may be sued within the meaning of this section except to the extent that it is in fact a polluter. While § 302(e) of the Act (42 U.S.C. § 1857h(e)) defines "person" to include a "State, municipality, and political subdivision of a State," two circuits which have considered this question and examined closely the legislative history of the Act have concluded that in fact a state or subdivision thereof is only a person subject to an enforcement suit pursuant to § 113 (42 U.S.C. § 1857c–8), the Administrator's enforcement suit provision, where the state is a polluter. *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); *District of Columbia v. Train*, 172 U.S.App. D.C. 311, 521 F.2d 971 (1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976). Both circuits rejected the idea that an enforcement suit may be brought to compel a state or subdivision to enforce a plan against citizen-polluters.

The Ninth Circuit and the D.C. Circuit both found that the ambiguous legislative history of the Act (*Brown*, 521 F.2d at 835–36) the double notice provisions of §§ 113(a)(1) & (2) (42 U.S.C. §§ 1857c–8(a)(1) & (2); and the provision in § 113(a)(2) for federally assumed enforcement of a plan when a state has failed to effect the provisions of a plan, taken to-

gether, compel the conclusion that enforcement suits against a state or subdivision pursuant to § 113,[6] are only available where the state is itself a polluter.

As the Ninth Circuit found, Congress could easily have included language in the statute which would have made clear the Administrator's authority to bring a civil action against a state or subdivision for failure to enforce a plan. *Brown*, 521 F.2d at 834 (suggesting language Congress could have included); see *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976).

Furthermore, even if a "person" subject to suit were read to include a state and its subdivisions for all purposes, § 304(a) of the Act renders such a person subject to a citizen's suit only for "violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. . . ." Section 304(f) defines "emission standard or limitation" to mean:

> "(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, or
>
> (2) a control or prohibition respecting a motor vehicle fuel or fuel additive,
>
which is in effect under this chapter . . . or under an applicable implementation plan."

A violation of an emission standard or limitation or of an order with respect to such a standard or limitation must necessarily be committed by a polluter who is required to comply with such a standard or limitation.[7] To find that a state or its subdivision's non-enforcement of a plan constitutes a violation of an emission stan-

---

**6.** This same analysis is of course applicable to § 304, the citizen suit provision. To hold otherwise would be illogical since it would give a citizen broader power to enforce a plan than it does the Administrator. This logic is supported by the fact that § 304(b)(1)(B) disallows a citizen suit if the Administrator or a State has already commenced an action. Moreover, § 304(c)(2) permits the Administrator to intervene in a citizen's suit.

**7.** While certain orders have been entered by the Administrator against New York State and City, and are the subject of a related case in this district (*United States of America v. State of New York*, 76 Civ. 837), such orders may logically be the subject of suit only to the extent that they have been "issued . . . with respect to such a standard or limitation." Those orders which were entered on consent

dard or limitation would require a significant enlargement of the definition of "emission standard or limitation." [8] It was just such an expansion of this definition which the Supreme Court declined to make in *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). There a state was attempting, pursuant to § 304, to sue to compel federal facility compliance with the terms of the State's implementation plan. The Court read the definition of "emission standard or limitation" narrowly and ruled that it would not extend the definition to all state implementation measures. The Court felt that Congress must evince an intention to bind the United States "with satisfactory clarity," which clarity it found lacking in the statute. 96 S.Ct. at 2022.

Congress can be expected to evince no less clarity when acting in the delicate area of federal-state relations. That legislation may encounter 10th amendment difficulties even when enacted pursuant to the commerce clause has recently been made clear. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

■ For all of these reasons and in view of the thorough and convincing analysis of the Ninth and D.C. Circuits in the *Brown* and *District of Columbia* cases, I am convinced that the proper construction of § 304 is that citizen's suits are authorized against the states and their subdivisions, only to the extent that they are actual polluters, that is violators of emission standards or limitations.[9] This result has, as the *Brown* and *D.C.* courts noted, the additional appeal of resolving the potential conflict between the 10th amendment [10] and the construction urged by plaintiffs.

■ It is a classic rule of both statutory construction and constitutional law that where a case presents both a challenge to the constitutionality of a statute and a construction of the statute which avoids the constitutional problem, that it is preferable to resolve the matter on the basis of the constitutionally acceptable construction. *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Moreover, "statutes should be construed wherever possible so as to uphold their constitutionality." *Graham v. Richardson,* 403 U.S. 365, 382–83, 91 S.Ct. 1848, 1857, 29 L.Ed.2d 534 (1971). Thus, in view of the serious 10th amendment problems [11] which they found to be raised by the Ad-

---

may not be affected by this opinion. See p. 647, infra.

**8.** As the D.C. Circuit found, § 113(a)(2) "draws a clear distinction between 'violations of an applicable plan' and 'a failure of the State in which the plan applies to enforce the plan effectively.'" 521 F.2d at 985. Thus that court concluded that inadequate state enforcement of a plan was not itself a violation within the intent of Congress. "Rather, the term 'violation' must logically refer to the emission of pollutants into the air contrary to the provisions of an applicable implementation plan." 521 F.2d at 986. For the reasons set forth in note 6, supra, the grounds for suit available to a citizen under § 304 can be no broader than those available to the Administrator under § 113.

**9.** But see *Maryland v. EPA,* 530 F.2d at 224. That court struck down substantive regulations which imposed affirmative enforcement duties on the state as violative of the 10th amendment. In so doing, the court suggested that a state is a person which would be subject to suit for failure to perform such unconstitutional duties were the regulations not vacated.

**10.** The 10th amendment to the Constitution provides that:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**11.** Not only were the Ninth and D.C. Circuits (*Brown* and *District of Columbia*) convinced that the Act would contravene the 10th amendment were the construction urged by EPA adopted, but the Fourth Circuit also found that any attempt to impose affirmative enforcement responsibility on the states was violative of the 10th amendment. (*Maryland v. EPA,* supra.) The recently decided *National League of Cities* case only strengthens the 10th amendment analysis employed by those courts.

Moreover, although the court in *Commonwealth of Pennsylvania v. EPA,* 500 F.2d 246 (3d Cir. 1974) rejected the 10th amendment analysis later embraced by these three courts,

ministrator's interpretation of § 113, the Ninth and D.C. Circuits chose to read the statute in such a way as to render it both constitutionally valid and consistent with what they found to be the legislative intent.[12]

■ Of course, none of this is to gainsay the proposition that Congress preferred, in so far as possible, that the states take the initiative in enforcing the implementation plans. However, apparently mindful of the delicate balance between Congressional objectives and state's rights, Congress wrote into the Act a structure which would encourage the states to do just that. Thus the states were given an opportunity under § 110 of the Act (42 U.S.C. § 1857c–5) to submit their own proposed implementation plans to the Administrator.[13] If, however, no plan or an inadequate plan is submitted, the Administrator is required to promulgate his own implementation plan for the state. He may not order the state to draft a plan according to his specifications. *Maryland,* 530 F.2d at 226–27; *District of Columbia,* 521 F.2d at 981–84.

This structure is paralleled in § 113(a)(2) of the Act which provides for federally assumed enforcement where a state has failed to enforce the plan effectively. 42 U.S.C. § 1857c–8(a)(2). See *Brown,* 521 F.2d at 834.

Rather than making states subject to suit for their failure to devise an adequate plan

---

it relied heavily on *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) which has since been overruled by *National League of Cities,* 96 S.Ct. 2465.

In *National League of Cities* the Supreme Court struck down the 1974 amendments to the Fair Labor Standards Act which made federal minimum wage and overtime laws applicable to almost all public employment. In so doing, it held that where federal legislation displaces the freedom of local government to make choices in areas of its traditional or integral government functions, such legislation is not within the commerce clause of the Constitution. Art. I, Section 8. 96 S.Ct. 2465. See *Coyle v. Smith,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911).

The Court also rejected language in *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), which seemed to suggest that no activities of a state were beyond the scope of Congress' commerce power. Nevertheless, the Court upheld the result in *United States v. California* since it found that the activity regulated therein, the operation of a railroad, was not an integral area of state government. 96 S.Ct. at 2465.

Finally, the suggestion that Mr. Justice Blackmun, in his concurrence in *National League of Cities,* indicated that he would join the dissenters to form a new majority in an environmental case goes far beyond what the Justice actually said. What he said was that majority's "balancing approach . . . does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where *state facility compliance with imposed federal standards* would be essential." 96 S.Ct. at 2476 (emphasis added).

Rather than supporting the plaintiff's position, Justice Blackmun's language supports the conclusion that a state as polluter may be forced to comply with federal standards, but that the balancing approach would preclude compelling the state to control its citizens in any particular way.

Mr. Justice Stevens' dissent in *National League of Cities* also describes state activities subject to federal regulation. He lists polluting activities such as burning coal in the capitol, dumping refuse from a state-owned garbage truck, driving the governor's limousine or the garbage truck over 55 miles an hour. Justice Stevens describes these polluting activities as "activities of the state *qua* state" which are "subject to federal regulation." 96 S.Ct. at 2488. But, beyond such polluting activities he does not go.

12. Because of the disposition of this motion on the construction of the statute, it is unnecessary to reach the parties' various positions on the standing of the City to raise the 10th amendment as a defense. Suffice it to say that the arguments of the various parties must also take into account the impact of *National League of Cities* on even this aspect of such a challenge. 96 S.Ct. 2465.

13. Of course a state can be expected to prefer that its own plan be approved. At the same time, the Administrator cannot be expected to approve a plan with which he is not satisfied. Thus to the extent that a state benefits from having its plan approved, there is no hardship to the Administrator who has been spared the burden of drafting the plan and who was always free to reject it if inadequate.

Likewise, a state can be expected to see an advantage to administering a plan itself if only to avoid "hordes of federal employees" enforcing the plan for an unwilling state. See *Maryland,* 530 F.2d at 227, 228.

or to enforce a plan, Congress gave the Administrator the authority to promulgate a plan and to assume enforcement should the state's performance of these functions prove inadequate. In order to insure a greater likelihood of state involvement in enforcement the Administrator was to determine that any plan he approved contained, among other things, assurances of adequate personnel, funding, and authority to carry out the plan. 42 U.S.C. § 1857c–5(a)(2)(F). See *District of Columbia*, 521 F.2d at 984 n. 20; *Maryland*, 530 F.2d at 226–27.

In this connection it is noteworthy that the Second Circuit, in approving the TCP, found that in postponing the date for the submission of legislative authority and detailed regulations (40 C.F.R. § 52.1683), the Administrator had acted within the discretion granted him in the Act. *Friends of the Earth v. EPA*, 499 F.2d at 1124. However, as to the petitioners' charge that the Administrator had not received adequate financial assurances, the Court of Appeals granted the petition for review and directed the Administrator "to provide a detailed statement of his rationale on this matter." 499 F.2d at 1126, 1129. Apparently, this was not done. See *Natural Resources Defense Council, Inc. v. EPA*, 478 F.2d 875, 890–91 (1st Cir. 1973).

The fact that in this case the Administrator chose not to reject New York's proposed plan for lack of adequate assurances is no reason to upset the well-balanced scheme devised by Congress. In effect, the Administrator assumed the risk in approving the plan that the lacking legislative authority and regulations which he postponed (40 C.F.R. § 52.1683) and the possibly inadequate financial assurances would result in the state's non-enforcement of the plan.

■ Once a plan has been approved by the Administrator it is in the same posture as a plan which the Administrator has promulgated for purposes of enforcement. See *District of Columbia*, 521 F.2d at 982–83. The contention of plaintiffs that by submitting a plan the state and its subdivision consented to enforce it is defeated by the facts, by logic and by the plain language of the Act.

In view of the fact that the TCP was submitted by the Governor alone without any legislation and without legislative assurances (see p. 645 supra), it cannot be said that any binding commitment to enforce the plan was ever made by the state. Thus the Governor's submission was the functional equivalent of the suggestions of an interested party at hearings the Administrator might have held on his own plan. Likewise, approval of the plan was the functional equivalent of promulgation by the Administrator of his own plan.

Nor can it be said that the City which, through the Mayor, gave only limited assent to the submission of the plan, bound itself to enforce the TCP. In fact, the Mayor expressed financial reservations which must have been understood as an indication that the City would not, absent adequate federal funds, enforce the TCP. These financial reservations were echoed in the Governor's letter accompanying the plan to the Administrator. Undoubtedly, these expressions of limited financial commitment were factors which prompted the Court of Appeals to grant the petition to review the plan on this ground. 499 F.2d at 1126, 1129. As noted above, the Administrator apparently never submitted the requested rationale on this point.

Secondly, in view of Congress' policy to encourage state cooperation, it is highly unlikely that a state-submitted plan was intended to carry with it an enforceable duty of implementation since such an obligation would penalize states which drew up acceptable plans. If submission of a plan were deemed to be a promise to enforce the plan or otherwise be subject to suit, states would effectively be discouraged from submitting adequate plans in order to avoid possible enforcement proceedings.

Finally, as demonstrated above, the civil suit provisions of the Act do not, by their terms, permit suits against the states and their subdivisions to compel enforcement of either a state-submitted or an Administrator-approved plan. Nor does the provision

in § 113 for federally assumed enforcement draw any distinctions between Administrator-approved and Administrator-promulgated plans. In fact, the enforcement procedures available pursuant to § 113 of the Act apply to an "applicable implementation plan" which is defined in § 110(d) (42 U.S.C. § 1857c–5(d)) as either an Administrator-approved or Administrator-promulgated plan. See *District of Columbia,* 521 F.2d at 983.

■ The only option available to the Administrator when the state does not submit an adequate plan is to promulgate a plan himself. The only option available to the Administrator when the state does not enforce a plan is to enforce the plan himself and to sue the actual polluters or violators of the plan's requirements. Federal enforcement continues until the "State satisfies the Administrator that it will enforce such plan . . . ." 42 U.S.C. § 1857c–8(a)(2). Such a showing by the state of willingness to enforce must be "an act of voluntary cooperation rather than one made under the compulsion of a compliance order or civil action." *District of Columbia,* 521 F.2d at 986, 992–93.

## IV. THE PROPOSED ORDERS

The only remaining question is to what extent the defendants are polluters in violation of an emission standard or limitation with respect to the four strategies on which summary judgment was granted.

■ It is clear that the TCP itself is immune from attack. As approved by the Administrator and upheld by the Court of Appeals it is the applicable implementation plan for New York City and is, as discussed above, enforceable as such. See note 5, supra. Moreover, to the extent that activities of the defendants conflict with the federally-approved strategies they must yield pursuant to the Supremacy Clause of the Constitution. See *Brown,* 521 F.2d at 832, 841; *District of Columbia,* 521 F.2d at 988–89. This is so because the Act itself is within Congress' power under the commerce clause to regulate air pollution.

*South Terminal Corp. v. EPA,* 504 F.2d 646 (1st Cir. 1974).

However, non-interference with federal regulations and affirmative action are distinct standards. Certainly the Administrator may invite the defendants to implement the TCP or even lure the defendants into such action by the promise of financial or other benefit. See *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). In fact, to the extent that any of the defendants have signed consent orders to implement the plan they may well be bound. However, beyond that they may only be required to act to the extent that they are polluters in violation of an emission standard or limitation.

The court's analysis in *District of Columbia* is instructive on drawing the necessary distinction. That court found that a state's operation of a direct source of pollution such as a state-owned fleet of cars must certainly conform to federal regulations. It went on to find that the "streets and highways and bus systems of the states" are factors which influence the use of pollution sources by others and are therefore subject to direct regulation, apparently as indirect sources. 521 F.2d at 989. For this reason the court upheld strategies in the plan under review which required the state to construct exclusive bus lanes and purchase additional buses for its fleet.

In so doing the court analogized "these state owned transportation systems" to the railroad operated by the state in *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). See note 11, supra. Such regulation, if proper, is in no way limited by the financial burden it places on the state. 521 F.2d 990. See *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

However, as to the strategies requiring the institution of inspection and maintenance and retrofit programs for citizens' vehicles, the D.C. Circuit held that the imposition of a new affirmative action program, as opposed to the modification of an existing activity went beyond regulation of

the state as polluter.[14]   While the state could be prohibited from licensing non-conforming vehicles, it could not be required to take affirmative action to insure private vehicles' compliance with federal regulations.

The court's upholding the requirements relating to construction of bus lanes and purchase of additional buses merits special attention.   Clearly, the buses themselves are not being regulated as direct polluters since the addition of buses to the fleet could only mean additional emissions from this source.   The bus system would not even appear to be a true indirect source of pollution since it in no way encourages private automobile operation.   The logical question that follows is could a private bus company be ordered by the Administrator to purchase additional buses.

It would appear that the bus system must have been seen as a useful tool in discouraging automobile traffic which tool happened to be in the hands of the state. Whether or not such a tool, however useful, is subject to federal regulations which impose affirmative action requirements as opposed to negative restraints is raised here only as an aid to examining New York's TCP.

The question at hand is the extent to which the defendants may be ordered to comply with the four strategies on which summary judgment has been entered.   The threshold problem is the lack of specificity in the strategies themselves.   There being no implementing regulations, the strategies are little more than general descriptions of goals sought and suggested methods for achieving the goals.   Thus to determine those portions of each strategy which impose affirmative duties, that is to say standards or limitations, on the defendants as polluters is a difficult task.   The proposed orders are helpful in this regard.   The Administrator's own regulations, 40 C.F.R. § 52.06, would appear to impose on the

Administrator the duty of first promulgating the specific implementing regulations which defendants have failed to submit. Whether or not such regulations would, as adopted by the Administrator, be subject to review is questionable.

Nevertheless, in view of the urgency which the pollution problem presents and without intending this as any sort of advisory opinion, I shall indicate generally which portions of the strategies and proposed orders appear to be properly within my jurisdiction under § 304 to impose on defendants.   Thereafter, plaintiffs will be directed to settle a new order on notice which harmonizes this opinion with any consent orders which may already be binding on defendants.   See note 7, supra.

Plaintiffs argue that all four strategies (reduction of CBD parking, selective ban on taxi cruising, tolls on East River and Harlem River bridges, after-hours goods deliveries) involve how the state and city use and operate their streets and highways and are thus consistent with the *District of Columbia* case.   This proposition appears to me overly broad.

■   The reduction in CBD parking involves the attempted regulation of the defendants both as polluters and as enforcers of the strategy.   The elimination of certain on-street parking would appear to be an enforceable duty since on-street parking undoubtedly draws automobiles into the City and is thus an indirect source of pollution.   Likewise, a freeze on new permits for off-street garages or lots might be enforceable.   However, the development of a plan, the collection of data (except insofar as the City's own facilities are involved), the conducting of studies, incentives to garage operators to abandon their off-street facilities, and the purchase and closing of garages all appear to be outside the proper scope of an order.

■   The selective ban on taxi cruising apparently involves considerable data col-

---

**14.**   Another strategy requiring the construction of a system of bicycle lanes was questioned by the court in that it would have constituted the creation of a new transportation system rather than the modification of an existing system. However, the bicycle-related regulations were set aside on other grounds.

lection, public education programs, and plan formulation. All of these appear to be outside the scope of a proper order. However, to the extent that a proposed order may call for restraints on licensing, such restraints may be enforceable as the regulation of an indirect source of pollution.

■ The after-hours goods delivery strategy is similar to the taxi strategy. The development of a plan, the necessary studies, and the development of demonstration projects all appear to be beyond the defendants' responsibility. Of course, inasmuch as defendants are either receivers of goods in government office buildings or deliverers of goods they may be forced to comply with a federally imposed schedule for after-hours goods delivery.

The imposition of tolls on the East River and Harlem River bridges presents a special set of problems. On the one hand the bridges could be said to facilitate the entry of cars into Manhattan. On the other hand, the construction of toll plazas and imposition of tolls could be viewed as the initiation of an affirmative program similar to the inspection and maintenance and retrofit program which the D.C. Circuit declined to impose on the District of Columbia. In fact, this strategy appears to go beyond the requirement in that case that the state construct exclusive bus lanes. See discussion at pp. 646–647, supra.

The parties have recently brought to my attention the position of Federal Highway Administration ("FHWA") that at least four of the bridges in question (Hamilton, Washington, Williamsburg, and Manhattan Bridges) have been, to some extent, constructed with federal funds and thus may not be tolled. 23 U.S.C. § 301. This position raises the question of who is in fact primarily responsible for the indirect source of pollution which the bridges are claimed to be. As the D.C. Circuit noted:

"If responsibility for correcting air pollution problems arising from the operation of a regional system of streets and highways is to be assigned on the basis of the extent to which each jurisdiction has encouraged the use of automobiles, we would note that the federal government with its massive appropriations for highway construction bears a significantly higher portion of the blame than the Administrator's statements acknowledge." 521 F.2d at 990–91, f.n. 25.

This question of responsibility coupled with the EPA's position that the state need only procure special Congressional legislation in order to repay the federal funds expended on the Hamilton Bridge and repay the funds expended on the other three bridges leaves me in serious doubt as to the defendants' responsibilities on the four bridges in question. Plaintiffs maintain that this problem is raised by FHWA too late since it was known to FHWA in 1973; that three of the bridges are not § 301 bridges since federal funds were used only to resurface the Washington Bridge and to construct approaches for the Williamsburg and Manhattan Bridges; that the Hamilton Bridge is covered by § 129(b) of the Highway Act which authorizes the Department of Transportation to approve toll bridges on Interstate routes; that 23 U.S.C. § 109(j) requires that highways constructed with federal funds be "consistent with any approved plan for the implementation of" air quality standards under the Clean Air Act; and finally that the FHWA has no authority to and will not impose sanctions on defendants for imposing tolls on the bridges.

The FHWA denies all of these arguments. I find that this question is not properly before me for purposes of its resolution at this time. As the plaintiffs argue, we are dealing with an approved, and therefore enforceable, plan. However, the existence of the problem and the solution posed by EPA modify the degree to which responsibility for this strategy (at least as to the four bridges in question) can reasonably be imposed on defendants.

The plaintiffs have argued that responsibility for this strategy may be imposed on the defendants since the federal government could order the bridges closed. This argument only further suggests to me that because of the shared authority over the bridges between the State and City on the

one hand and the federal government on the other, the ultimate responsibility for the strategy must rest (at least as to the four bridges in question) with the federal government.

As far as the other nine bridges involved in this strategy are concerned, I will await the submission of proposed orders from the parties and will hear further argument on this point. Of course, to the extent that the State has or may consent to assume responsibility for this strategy and legislate to implement it, I have no intention of intruding.

The previously entered partial summary judgment in favor of plaintiffs is modified to the extent consistent with the foregoing opinion. Because the requirements of 28 U.S.C. § 1292(b) have been met, this disposition of the City's motion is certified to the Court of Appeals.

Settle order on notice.