FRIENDS OF THE EARTH, etc., Plaintiffs,

v.

Hugh CAREY et al., Defendants.

No. 74 Civ. 4500.

United States District Court, S. D. New York.

July 5, 1977.

Ross Sandler, David Schoenbrod, Eric Goldstein, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City, for City Defendants; Joseph F. Bruno, Stephen Kramer and Jack Brennan, Asst. Corp. Counsels, New York City.

Louis J. Lefkowitz, Atty. Gen., New York City, for State Defendants; Paul Shemin, New York City, of counsel.

Robert B. Fiske, U.S. Atty., New York City, for Federal EPA by Anne Sidamon-Eristoff, Asst. U.S. Atty.

Before KEVIN THOMAS DUFFY, District Judge.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiffs have moved this Court for an order compelling the city defendants to comply with Strategy B–3 of the Transportation Control Plan, the parking reduction strategy, as it is incorporated into the February 22, 1977 order of this Court.

The defendant United States Environmental Protection Agency (the EPA) has joined in the plaintiffs' application. The city defendants have cross-moved to modify or to stay the February 22, 1977 order. The State apparently has joined in the city's motion.

Prior to discussing the arguments advanced by the parties, it would be useful to briefly outline the history of the Transportation Control Plan and of this case.

In 1970 Congress amended the Clean Air Act to require the Administrator of the EPA to establish two types of air quality standards: the "primary ambiant", which was intended to protect the public health,

and the "secondary ambient", designed to protect the public welfare.

The primary standards governing pollution levels were promulgated on April 30, 1971. Section 110(a) of the Clean Air Act required each State to submit a plan providing for implementation, maintenance and enforcement of the primary standards. Each State plan was to be filed by April 1973, and the primary air quality standards actually met by May 31, 1975.

The State of New York did in fact submit a plan to the EPA on April 17, 1973, entitled "The Transportation Control Plan for the Metropolitan New York City Area," which contained 32 so-called strategies for reducing air pollution. Among them were the four strategies contained in my February 22, 1977 order: a selective ban on taxi cruising, a limitation on after-hour deliveries, a reduction of parking and the imposition of tolls on the East and Harlem River crossings.

On June 22, 1973, the EPA approved the plan submitted by the State of New York with a few modifications including the grant, at the State's request, of a 19–month extension to comply with the photo-chemical oxidant and carbon monoxide standards.

Following the EPA approval, a group known as Friends of the Earth petitioned the Court of Appeals pursuant to Section 207(b)(1) of the Clean Air Act for review of the approved New York plan, alleging that it was inadequate to meet the air quality standards of the Act. The Court of Appeals substantially upheld the plan and remanded to the EPA for review of several aspects of the plan. In the same opinion the Court of Appeals, by Judge Lumbard, declined to order compliance with the plan on the ground that the jurisdiction to enforce did not lie with the Court of Appeals, but rather with the District Court through an enforcement action brought by the EPA under Section 113 of the Clean Air Act, or by a private citizen under Section 306.

On August 5, 1974, the plaintiffs served notice under Section 304(b)(1)(a) of their intention to commence a citizens' suit. On October 11, 1974, at the expiration of the required sixty-day waiting period the plaintiffs commenced this action. Thereafter, the plaintiffs moved for a preliminary injunction enforcing the plan. In oral argument the Assistant Attorney General representing the State of New York acknowledged that, and I quote: "This plan is a legally enforceable plan, is a legally adequate plan and that the State is committed to fulfilling its responsibilities thereunder."

At that time the Assistant Attorney General also advised this Court that the Governor Elect supported fully the implementation of the plan as it existed. The attorney for the city defendants argued that I should deny the injunction, in light of the pendency of negotiations with the EPA aimed at a revision of the plan.

On December 16, 1974, I ruled that "The policy favoring judicial restraint in cases such as this coupled with the probability of enforcement action by the USEPA dictate the application for preliminary injunction at this time be denied." 389 F.Supp. 1394, 1396.

Seven months later plaintiffs moved for an injunction against the planned increase in the New York City subway fare and again moved for injunction enforcing the Transportation Control Plan. Once again I denied the injunction against the fare increase, since the Transportation Control Plan contained no provision addressing the subway fare. And I denied the renewed request for enforcement of the plan and denied summary judgment to the plaintiffs. 401 F.Supp. 1386.

On August 29, the day after my filing that opinion, the plaintiffs filed a notice of appeal from my order.

On September 23, 1975, the city moved to dismiss the complaint on the constitutional grounds. The motion was held in abeyance pending the appeal to the Second Circuit.

On April 26, 1976, a panel of the Court of Appeals affirmed my decision not to enjoin the fare increase, but reversed my denial of summary judgment to the plaintiffs. In so doing the Court of Appeals stated as follows:

In denying relief under the citizen suit provision the Court referred to the existence of ongoing negotiations between the EPA and the State and City authorities designed to reach consent decrees in carrying out the Plan's mandated strategies. We join the District Court in recognizing the utility of such deliberations and the desirability of obtaining compliance through consensual means. But it is equally clear that the statute empowers neither the EPA nor the State to delay the approved Plan's strategies through negotiations, be they formal or otherwise. Negotiations are no substitute for enforcement and for timely compliance with the Plan's mandated strategies. Consequently, the District Court erred in permitting the continuation of the EPA- State discussions to bar suit by citizens groups seeking judicial enforcement of the Plan's expressed provisions. The Act authors only two procedural routes for modifying the Plan: a Section 110(a)(3) revision or a Section 110(f) postponement. In all other instances the State is relegated to a lone option compliance. 535 F.2d 165, 178.

Partial summary judgment for the plaintiffs was then entered. The city petitioned the Court of Appeals for a rehearing. And although rehearing was denied, the Court of Appeals modified its mandate to permit me to consider the city's motion to dismiss as previously mentioned, which was filed on September 23, 1975.

In an opinion on July 13, 1976, 422 F.Supp. 638, I ruled, and I am quoting only in part, "that the proper construction of Section 304 is that citizen suits are authorized against the states and their subdivisions only to the extent that they are actual polluters or violators of the plan's requirements."

The parties appealed from my order and the plaintiff filed a petition for a writ of mandamus against me in the Court of Appeals.

On January 18, 1977 the Court of Appeals reversed my determination and granted the petition for mandamus, directing me to reinstate partial summary judgment as to the four strategies.

In the course of its opinion the Court stated as follows:

At this date almost four years after the Administrator's approval of the Plan, to permit the City to renege upon its commitments would defeat the purpose of the Act, which is to protect the public health.

Since the City could have advanced its present contentions by way of a petition for review of the Administrator's approval of the Plan in 1973, and chose instead voluntarily to commit itself to enforcement of the plan, we hold that the City has waived its right to assert these contentions.

552 F.2d 25, 35.

On the very same date that the mandate from the Court of Appeals was filed, I ordered all counsel in this case to appear before me. Counsel for the city was asked if there was any reason why I should not enter partial summary judgment for the plaintiff in light of the Court of Appeals mandate. Counsel for the city voiced no objection and in fact indicated that the form of the order submitted by counsel for the plaintiff and for the EPA was agreeable to the city with the sole exception of the dates for compliance with various stages of the plan.

On February 22, 1977, I filed an order which incorporated the four strategies contained in the plan. The order established a series of compliance deadlines aimed at the ultimate implementation of those strategies. Pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure the city defendants now seek to stay two of the four strategies, the parking reduction strategy, B3, and the bridge tolls strategy, which is B7.

In support of its application the city has filed a 300-page submission which includes affidavits from the Corporation Counsel, the Mayor, the Deputy Mayor for Economic Development, Chairman of the New York City Chamber of Commerce, the Administrator of the New York City Environmental

Protection and Transportation Agencies, and the Police Commissioner.

Included as exhibits to the affidavits are a study entitled "The Evaluation of the Economic Pact of the Court-ordered Transportation Control Plan Strategies" dated June 21, 1977, a June 1977 study of the Transportation Control Plan prepared by the Department of Air Resources, and an April 1977 study by the New York City Transportation Administrator, entitled "Traffic Impact of Tolls on the East and Harlem River Bridges."

The plaintiffs herein have produced a number of documents which if this were a trial could be considered affecting the viability of such studies. This is not a trial, however, and I see no need to get into the matter.

In seeking a stay or modification, the City relies upon the principle of equity, succinctly stated in Justice Cardozo's opinion in *United States v. Swift & Company*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932): "A continuing decree of injunction directed to events to come is subject always to adaptation as events shape the need."

This approach can also be found in other cases but not as well put. Thus it is for me now to determine whether any events have occurred since the entry of the February 22, 1977 order which would suggest the need for adaptation or stay of the order.

The arguments advanced by the city fall into four broad categories.

First, that the plan will be economically destructive to the city.

Second, that the plan will be ineffective in reducing air pollution.

Third, that the plan removes discretion from city officials to cope with police and traffic problems.

And fourth, that the likelihood of the Supreme Court granting the city's petition for certiorari warrants a stay.

■ The economic consequences of the plan and its effectiveness in improving air quality are issues which were assessable by the city officials long before the entry of the February 22nd order. Although the city has conducted surveys and studies, apparently since February 22, there is no indication that these studies were based upon newly developed facts. Rather, they appear to be based on data which has always been obtainable.

The effectiveness of the plan and its economic consequences are indeed the legitimate concerns of the municipal officials. But the time to begin evaluation is not after the submission of the plan, approval by the EPA, three appeals to the Second Circuit and the entry of a final order enforcing the four strategies. To permit a stay of the plan at this stage would be to place a premium upon inaction.

■ The claim of unwarranted interference with the discretion of the city officials was raised in the city's motion to dismiss on Tenth Amendment grounds, and as previously noted, I ruled substantially in the city's favor. But that determination has since been reversed on appeal. Having raised the claim and lost, the city defendants may not attempt to relitigate in this forum.

■ Nor does the pending of a petition for writ of certiorari provide an adequate basis for a stay. No factual or legal basis has been offered for the Corporation Counsel's belief that the city's certiorari petition will be acted upon favorably. Before a stay will be granted, more must be shown than a party's belief that his side will ultimately prevail. *See O'Brien v. Brown*, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).

In the light of the lengthy history of this case and the express direction of the Court of Appeals that I implement the plan expeditiously, the application for a stay is denied.

The city officials are not, however, without recourse to present new insights into the efficacy of the plan. Congress has provided that revisions of an approved plan may be sought through application to the EPA pursuant to Section 110(a)(3) of the Clean Air Act. A postponement may also

be sought under Section 110(f). The EPA, the agency responsible for enforcing the Clean Air Act, is best able to determine whether aspects of the plan require revamping.

I now turn to the joint application by the plaintiffs and the EPA to compel compliance with my order as it related to strategy B–3, the parking reduction strategy. The order requires the City defendants to submit to the EPA by May 14, 1977 a detailed work program to reduce and manage parking throughout the borough of Manhattan.

In regard to the Midtown Core—that area of Manhattan from 59th Street to 34th Street and 8th Avenue to 3rd Avenue—the submission was to contain a plan to eliminate all legal on-street parking spaces by June 14, 1977 as well as a plan to eliminate illegal on-street parking by January 14, 1978 through increased towing capabilities at a minimum level of removal of 500 automobiles per day. The City was to have submitted legally enforceable limitations upon the construction of new commercially available and non-commercially available parking spaces within the Midtown Core.

As to the Downtown Core—that area extending from Canal Street to the extreme southern tip of Manhattan between the East and Hudson Rivers—the City was required to submit a work plan—also by May 14, 1977—to provide for a ban on general on-street automobile parking between the hours of 8:00 A.M. and 6:00 P.M. with the exception of existing metered spaces which could be used legally at times other than rush hours. That is, from 7:00 A.M. to 10:00 A.M. and from 4:00 P.M. to 7:00 P.M. on week days. The ban was to take effect on June 14, 1977.

The downtown core work plan was also to have contained provisions for eliminating illegal on-street parking by January 14, 1978, through increased towing capabilities. Legally enforceable limitations on construction of new commercially-available and non-commercially available parking also were to have been submitted.

For the peripheral area, that is, the remainder of Manhattan north of 59th Street from the East River to the Hudson River, those areas between Canal Street and 59th outside of the midtown core, the city was to have submitted a work plan by May 14 to provide for a ban on general on-street parking from 8:00 A.M. to 6:00 P.M. on week days with the exception of existing metered spaces which could be used legally at times other than rush hours. The peripheral area ban is to become effective in August, on August 31, 1977. The peripheral area work plan could at the city's option provide for parking on specified streets which are primarily residential and are zoned as such. Also by May 14, the city was to have submitted work plans for parking surcharges, late openings, car pool rate reductions, space capacity limitations by time of day and zoning bonuses for closings. In addition, a parking space inventory was to have been submitted.

The attorney for the Environmental Protection Agency has filed an affidavit with this Court, dated June 27, 1977, in which she submits that "The city defendants failed to submit any program of any kind to EPA by May 14, 1977, and none has yet been submitted."

Actually, on May 14, 1977, this Court did receive a submission from an Assistant Corporation Counsel which stated in part as follows:

"Pursuant to Paragraph E"—and I am quoting again—"of the order implementing Strategy B3, I wish to advise the Court that it is impossible for the city to make a submission required by Paragraph A," which concerns the midtown core, the downtown core and the peripheral area, insofar as these paragraphs relate to illegal on-street parking. "Enclosed herewith are copies of documents relating to the police department's towing program. It is the City's belief that the number of tows required by the paragraphs of the order was erroneously computed.

"We will shortly seek modification of the order so as to correct this error. In addition, it is impossible to comply with the provisions of paragraph A(a)(II)(aa)"—that

is the downtown core—"insofar as the paragraph relates to legal on-street parking because of the time required to manufacture and install necessary parking signs. Moreover, the submissions required by Paragraph A(2)(IV)" which deal with parking surcharges, late openings and car pools and all the rest of that, "will be included in the Parking Management Study." A copy of a proposed contract for this study was submitted to this Court on April 1, 1977.

Accompanying the letter were a number of submissions which purported to comply with the February 22 order: For example, the city submitted the following work plan for the midtown core, and I quote: "There are 206 meters with a revenue of $200,607. The meters can be made inoperative within 30 days by the Department of Traffic."

It is apparent from the city's own admissions contained in its May 14 letter to the Court that it has not fully complied with my order. My order required a work plan. Nothing even approaching that was submitted.

One of the immediate consequences of the failure to submit a proper work plan in advance of implementation is the present dispute among the parties as to the scope of the parking ban for the midtown core.

On June 14, 1977, the city imposed a 24–hour ban on all on-street parking in the midtown core. Plaintiff argued that the city's action was over-inclusive and a ban during business hours is all that is required. Had the city properly submitted its work plan to the EPA prior to the implementation, the ambiguity of which we heard so much today could have been eliminated prior to today.

In light of the city's admitted failure to comply with the order, the following is hereby ordered:

1. Counsel for the EPA is directed to forthwith submit a proposed order incorporating the one amendment to the February 22 order which I have approved already; that is, modification of the effective hours of midtown core parking ban;

2. The city is directed to submit to the EPA within ten days the work plans required by Paragraphs 2(a)(i)(aa) and 2(a)(ii)(aa) of the February 22 order;

3. The city is directed to submit to the EPA within thirty days all other materials which were originally due on May 14;

4. Should any of the defendants fail to comply with any of the above directions, counsel for the plaintiff or for the Environmental Protection Agency may commence contempt proceedings by submitting a proposed order to show cause.

So ordered.